Michael J. Shipley (SBN 233674)
mshipley@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Olivia Adendorff (admitted *pro hac vice*)
olivia.adendorff@kirkland.com
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 74205
Telephone: (214) 972-1758
Facsimile: (214) 972-1771

Martin L. Roth (admitted *pro hac vice*)
martin.roth@kirkland.com
Alyssa C. Kalisky (admitted *pro hac vice*)
alyssa.kalisky@kirkland.com
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Defendant*
*GoodRx Holdings, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JANE DOE, JANE DOE II, JOHN DOE, E.C., JOSE MARQUEZ, and HOLLIS WILSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOODRX HOLDINGS, INC., CRITEO CORP., META PLATFORMS, INC., AND GOOGLE LLC,<br><br>Defendants. | CASE NO. 3:23-CV-00501-AMO<br><br>**DEFENDANT GOODRX HOLDINGS, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY PROCEEDINGS**<br><br>Judge: Honorable Araceli Martínez-Olguín<br>Action Filed: May 26, 2023<br>Hearing Date: September 14, 2023<br>Time: 2:00 PM<br>Courtroom: 10, 19th Floor |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on September 14, 2023, at 2:00 PM, or as soon thereafter as the matter may be heard, in Courtroom 10, 19th Floor, of the United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, California 94102, Defendant GoodRx Holdings, Inc. ("GoodRx"), will, and hereby does, move the Court for an order compelling Plaintiffs Jane Doe, Jane Doe II, John Doe, and Jose Marquez's claims to arbitration and dismissing or staying this action. This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of Gracye Cheng ("Cheng Decl."), and such other matters, both oral and documentary, as may properly come before the Court.

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ....................1
II. BACKGROUND ....................2
A. GoodRx ....................2
B. Plaintiffs ....................3
1. Plaintiff Jane Doe's Use of GoodRx and Consent to GoodRx's Terms. .....4
2. Plaintiff Jane Doe II's Use of GoodRx and Consent to GoodRx's Terms. .5
3. Plaintiff John Doe's Use of GoodRx and Consent to GoodRx's Terms......6
4. Plaintiff Jose Marquez's Use of GoodRx and Consent to GoodRx's Terms.8
C. Plaintiffs Agreed to Arbitrate All Claims Regarding GoodRx's Services and Waived the Right to Proceed in Any Class Action. ....................8
1. Arbitration Agreement for Plaintiff Jane Doe. ....................9
2. Arbitration Agreements for Plaintiffs Jane Doe II, John Doe, and Jose Marquez. ....................10
D. Despite Agreeing to Arbitrate Their Claims Individually, Plaintiffs Nevertheless Filed Suit on Behalf of A Putative Class. ....................10
III. LEGAL STANDARD ....................11
IV. ARGUMENT ....................12
A. Plaintiffs and GoodRx Entered into A Valid and Binding Agreement to Arbitrate.12
B. The GoodRx Terms Clearly and Unmistakably Delegate Questions of Arbitrability to the Arbitrator ....................16
C. The Arbitration Agreement Is Valid, Enforceable, and Encompasses Plaintiffs' Claims. ....................17
1. The Arbitration Agreement Is Presumptively Valid and Enforceable.......18
2. Plaintiffs' Claims Fall Within the Scope of the Arbitration Agreement. ..18
D. Plaintiffs' New Request for a Public Injunction Does Not Relieve Them of Their

Obligations to Arbitrate Their Claims Individually. ............................................19

E. This Action Should Be Dismissed or Stayed. ......................................................21

V. CONCLUSION ..............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aanderud v. Superior Court*,
13 Cal. App. 5th 880 (2017) ....................17, 18

*Ajzenman v. Office of the Commissioner of Baseball*,
2020 WL 6037140 (C.D. Cal. Sept. 14, 2020) ....................20

*Alfia v. Coinbase Global, Inc.*,
2022 WL 3205036 (N.D. Cal. July 22, 2022)....................15

*Asimil Holdings Ltd. v. Carium Capital Mgmt. LLC*,
622 F.Supp.2d 825 (N.D. Cal. 2007) ....................22

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................11

*Bencharsky v. Cottman Transmission Sys., LLC*,
625 F. Supp. 2d 872 (N.D. Cal. 2018) ....................21

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ....................17

*Cabot Creekside 8 LLC v. Cabot Inv. Props., LLC*,
2011 WL 13223878 (C.D. Cal. Apr. 21, 2011) ....................21

*Caremark, LLC v. Chickasaw Nation*,
43 F.4th 1021 (9th Cir. 2022) ....................11, 12, 16

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) ....................11

*Congdon v. Uber Techs., Inc.*,
226 F. Supp. 3d 983 (N.D. Cal. 2016) ....................22

*Continental Grain Co. v. Dant & Russell, Inc.*,
118 F.2d 967 (9th Cir. 1941) ....................22

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) ....................12, 13

*Dwyer v. Dynetech Corp.*,
2007 WL 2726699 (N.D. Cal. Sept. 17, 2007) ....................22

*Forsyth v. HP Inc.*,
2018 WL 732722 (N.D. Cal. Feb. 6, 2018) ....................23

*Green Tree Fin. Corp.-Alabama v. Randolph*,
531 U.S. 79 (2000)....................18

*Hodges v. Comcast Cable Commc'ns*,
21 F.4th 535 (9th Cir. 2021) ....................20

*Johnson v. JP Morgan Chase Bank, N.A.*,
2018 WL 4726042 (C.D. Cal. Sept. 18, 2018) ....................20

*Larson v. Speetjens*,
2006 WL 3365589 (N.D. Cal. Nov. 17, 2006) ....................22

*Lee v. Postmates Inc.*,
2018 WL 4961802 (N.D. Cal. Oct. 15, 2018)....................19

*Lee v. Tesla, Inc.*,
2020 WL 10573281 (C.D. Cal. Oct. 1, 2020)....................23

*Lee v. Ticketmaster LLC*,
2019 WL 9096442 (N.D. Cal. Apr. 1, 2019), *aff'd*, 817 F. App'x 393 (9th Cir. 2020) ....................13

*Loewen v. Lyft, Inc.*,
129 F. Supp. 3d 945 (N.D. Cal. 2015) ....................21

*Lovig v. Best Buy Stores LP*,
2019 WL 2568851 (N.D. Cal. June 21, 2019) ....................22

*McGill v. Citibank, N.A.*,
2 Cal. 5th 945 (2017) ....................21

*Neurosigma, Inc. v. De Salles*,
2014 WL 12803168 (C.D. Cal. Jan. 31, 2014) ....................19

*Newton v. Neumann Caribbean Int'l, Ltd.*,
750 F.2d 1422 (9th Cir. 1985) ....................22, 23

*Oberstein v. Live Nation Entertainment, Inc.*,
60 F.4th 505 (9th Cir. 2023) .................... *passim*

*Oracle Am. Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) ....................17

*Pearl v. Coinbase Global, Inc.*,
2023 WL 1769190 (N.D. Cal. Feb. 3, 2023) ....................12

*Peter v. DoorDash*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) ....................13, 14

*Peterson v. Lyft, Inc.*,
2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) .................... *passim*

*Puri v. Golden Temple of Oregon, LLC*,
2010 WL 11595757 (C.D. Cal. June 9, 2010) ....................22

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010)....................16, 18

*Sparling v. Hoffman Const. Co., Inc.*,
864 F.2d 635 (9th Cir. 1988) ....................21

*Sponheim v. Citibank, N.A.*,
2019 WL 2498938 (C.D. Cal. June 10, 2019) ....................21

*SST Millennium LLC v. Mission St. Dev. LLC*,
2019 WL 2342277 (N.D. Cal. June 3, 2019)....................11

*Stiener v. Apple Computer, Inc.*,
2007 WL 4219388 (N.D. Cal. Nov. 29, 2007) ....................21

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ....................13, 14

*Textile Unlimited, Inc. v. A..BMH & Company*,
240 F.3d 781 (9th Cir. 2001) ....................21

*Tompkins v. 23andMe, Inc.*,
2014 WL 2903752 (N.D. Cal. June 25, 2014)....................14, 15

**Statutes**

9 U.S.C. § 2....................11, 17, 18

9 U.S.C. § 3....................21, 22

9 U.S.C. § 4....................11, 21

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ....................11, 16, 18, 22

**Rules**

AAA Consumer Arbitration Rule R-14 ....................17

## STATEMENT OF ISSUES TO BE DECIDED

This Court must decide whether to compel arbitration of Plaintiffs Jane Doe, Jane Doe II, John Doe, and Jose Marquez's claims, and, as a result, dismiss or stay this action.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Since its inception in 2011, GoodRx has helped ***millions*** of Americans save ***billions*** of dollars on health care. Specifically, to combat rising prescription drug costs, GoodRx allows users to easily search for and compare drug prices across local pharmacies and to access free coupons for additional savings of up to 80%. Plaintiffs Jane Doe, Jane Doe II, John Doe, and Jose Marquez (individually, "Plaintiff" and collectively, "Plaintiffs")[1] claim to be among those who have used GoodRx's services. In doing so, each Plaintiff agreed to abide by GoodRx's Terms of Use ("TOU"), including a requirement to arbitrate their claims on an individual basis and to waive any right to proceed in a class action. Now, they ask this Court to ignore their unequivocal and binding arbitration agreements and instead allow them to proceed on behalf of a putative nationwide class of "millions" in a federal court lawsuit. The law—and the contracts Plaintiffs agreed to—require otherwise.

When using GoodRx to access steep discounts and other services, each Plaintiff accepted GoodRx's TOU by affirmatively clicking a button or checking a box indicating such assent—on a screen containing conspicuous and colored hyperlinks displaying the full text of the TOU. The TOU, in turn, displayed a prominent arbitration agreement requiring Plaintiffs to individually arbitrate ***any*** dispute, claim or controversy arising out of or relating to the TOU or use of GoodRx's services. It requires Plaintiffs to arbitrate any threshold arbitrability issues as well, including relating to the interpretation, applicability, enforceability, or formation of the agreement. After taking affirmative steps to agree to the TOU, each Plaintiff decided to proceed to use GoodRx's services. The TOU thus constitutes a binding contract between each Plaintiff and GoodRx.

---

[1] There are two additional plaintiffs named in the Consolidated Class Action Complaint: Hollis Wilson and E.C.; at this time, GoodRx has been unable to confirm that either Wilson or E.C. used GoodRx's services or agreed to arbitrate their claims. GoodRx expressly does not waive and reserves the right to seek to compel Wilson and E.C.'s claims to arbitration if new or different information is uncovered.

The arbitration agreement within the TOU is valid and enforceable. The Ninth Circuit and courts in this District "routinely find clickwrap agreements [like those at issue here] enforceable" and accordingly compel arbitration. *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 513 (9th Cir. 2023); *Peterson v. Lyft, Inc.*, 2018 WL 6047085, at *2, 6 (N.D. Cal. Nov. 19, 2018) (compelling arbitration and dismissing case upon finding that a valid contract was formed upon the plaintiff's "clicking of the 'I accept' button" next to Lyft's terms of service). Additionally, here, the parties agreed to arbitrate ***all*** gateway questions of arbitrability. As such, any threshold challenge to the arbitration agreements and their validity must be referred to arbitration to be decided by an arbitrator, not this Court.

In short, each Plaintiff chose to agree to GoodRx's TOU—including the agreement to arbitrate their claims—in order to access GoodRx's significant savings and benefits; they cannot now disavow that assent, and their claims must be compelled to arbitration.

## II. BACKGROUND

### A. GoodRx

As Plaintiffs concede, GoodRx's mission is to "build better ways for people to find the right care at the best price." (Consolidated Class Action Complaint ("CAC") ¶ 1.) Indeed, since 2011, GoodRx has provided services aimed at combatting rising healthcare costs. (*Id.* ¶¶ 1–3.) It does so by allowing consumers to conveniently search for and compare drug price information across pharmacies and obtain coupons to allow further savings on drug purchases. (*Id.* ¶¶ 1, 3–4, 96–98.) GoodRx's coupons, which are redeemable at over 70,000 pharmacies nationwide, are ***free*** to access and offer average ***savings of up to 80%*** off the retail price of drugs. (*Id.* ¶ 4.) As Plaintiffs allege, "million[s]" of consumers have visited or used GoodRx's website and mobile application, meaning millions of Americans have been able to access steep discounts and cost-saving information on prescription drugs—including lifesaving, critical medications. (*Id.* ¶¶ 2–3.) Stated differently, GoodRx's services have allowed millions of consumers to gain access to drugs and treatments that they otherwise would not have been able to afford. (*Id.*)

To access GoodRx's free coupon service, users can visit GoodRx's website (www.goodrx.com) or mobile application. (*Id.* ¶ 2.) No prescription is required or uploaded as part of this process. To search for discounts, a user simply "enters the medication name and then selects a local pharmacy." (*Id.* ¶¶ 3,

98, Figure 2.) This can be done by someone with a prescription for that medication, or not. For instance, users may search drug names on GoodRx not because they have prescriptions or afflictions themselves, but rather, in order to help a relative or friend search for discounts for that drug. Likewise (and as is frequently the case), a doctor or medical professional may use GoodRx to search and compare different drugs to understand pricing variance and options for their patients. Or, a user may be a journalist or researcher, analyzing drug pricing. Users who wish to use GoodRx coupons then have three options: they can print a coupon, send the coupon to themselves via email or text message, or simply show the coupon webpage or app screen on their mobile devices to a pharmacist. (*Id.* ¶¶ 3, 98.) Again, no prescription is required by GoodRx in order to print, send, or display coupons; instead, the pharmacy filling the prescription and applying the discount separately obtains that information from the patient's doctor.

In addition to its core offering of free coupons and drug price information, GoodRx offers two additional services: GoodRx Gold and GoodRx Care (previously HeyDoctor). (*Id.* ¶¶ 5–6, 99–101.) GoodRx Gold is a paid subscription service that provides consumers access to greater coupon savings. (*Id.* ¶¶ 6, 101.) GoodRx Care is a technology platform that connects consumers with independent medical professionals to facilitate telehealth visits and provide steep discounts on those visits. (*Id.* ¶¶ 5, 99–100.)

**B. Plaintiffs**

Plaintiff Jane Doe alleges she is a citizen of Florida; Plaintiff Jane Doe II alleges she is a citizen of New Jersey; Plaintiff John Doe alleges he is a citizen of Illinois; and Plaintiff Jose Marquez alleges he is a citizen of California. (CAC ¶¶ 22, 28, 35, 46.) Each Plaintiff alleges to have used GoodRx's platforms to obtain services. (*Id.* ¶¶ 23, 29, 36, 47–48.) In so doing, each Plaintiff affirmatively agreed to GoodRx's TOU.[2] (Cheng Decl. ¶¶ 11–17, 32–37, 51–55, 70–73.) Indeed, as described in more detail below, as a condition of using GoodRx—whether for coupon, GoodRx Gold, or GoodRx Care services—each

[2] Counsel for GoodRx confidentially received Plaintiffs Jane Doe, John Doe, and Jane Doe II's identities from their respective counsel and have therefore been able to confirm facts regarding Plaintiffs' use of the GoodRx platform. However, at this time, the parties have agreed not to disclose Plaintiffs Jane Doe, John Doe, or Jane Doe II's identities in the public record. In addition, GoodRx notes that information on each Plaintiff's user status is based on GoodRx's reasonable investigation to date, and particularly, for Jane Doe II, whose identity was not revealed until May 31, 2023, GoodRx's internal diligence and investigation is ongoing. GoodRx therefore reserves the right to modify, supplement, and/or amend its statements if new or different information is discovered.

Plaintiff was presented with a mandatory clickwrap agreement through which they were required to check a box stating that they agreed to GoodRx's TOU or click a button below a notification stating that doing so manifested the same agreement. (*Id.*) Critically, at all relevant times, these TOU included a mandatory arbitration provision and class action waiver. (*Id.* ¶¶ 17–25, 37–46, 55–62, 73–80.)

**1. Plaintiff Jane Doe's Use of GoodRx and Consent to GoodRx's Terms.**

Plaintiff Jane Doe signed up for GoodRx Care by creating a GoodRx Care account on August 1, 2022. (CAC ¶¶ 23, 25; Cheng Decl. ¶ 7.) She visited the GoodRx Care platform a total of two times, first on August 1, 2022 and again on August 22, 2022. (*Id.*)

When Jane Doe created her GoodRx Care account, she was presented with a screen, shown below, which displayed a checkbox next to the words "I agree to the **Terms, Privacy Policy** and **Telehealth Consent**" that she had to click in order to proceed to sign up for an account. (Cheng Decl. ¶¶ 8–14.)




As shown above, the checkbox agreeing to the terms was ***separate*** from the "Start Your Visit" button, meaning Jane Doe had to specifically check "I agree" ***in addition*** to clicking "Start Your Visit." (*Id.*) The "Terms," "Privacy Policy" and "Telehealth Consent" texts were in bold, blue font, alerting Jane Doe to the fact that the terms were hyperlinked. (*Id.* ¶¶ 12–14.) This screen also included a checkbox next to the words "I agree to the **Marketing Authorization**," which was optional. (*Id.* ¶¶ 13–14.)

When presented with this screen, Jane Doe had the opportunity to view and scroll through the text of the TOU, Privacy Policy, Telehealth Consent, and Marketing Authorization. (*Id.* ¶ 15.) Jane Doe affirmatively consented to the TOU, Privacy Policy, and Telehealth Consent when she clicked the box "I agree." (*Id.* ¶¶ 16–17.) She also clicked "I agree" to the ***optional*** Marketing Authorization box. (*Id.* ¶ 18.) This means that beyond merely agreeing to the TOU, Jane Doe agreed to authorize the information she provided through her interactions with GoodRx Care to be used and disclosed by GoodRx and its affiliates for "marketing purposes." (*Id.* ¶ 18, **Ex. 1**, 2022 Marketing Authorization.)

The GoodRx TOU in effect in August 2022—at the time of Jane Doe's use—provides at its outset, in a bold section entitled "**Contractual Relationship**," that "[b]y accessing or using the Services, you confirm your agreement to be bound by these Terms, including the information set forth in our privacy policy, located **here**." (*Id.* ¶ 19, **Ex. 2**, 2022 TOU § 1.)

**2. Plaintiff Jane Doe II's Use of GoodRx and Consent to GoodRx's Terms.**

Plaintiff Jane Doe II alleges to have been a coupon user from 2016 to 2023, and a GoodRx Gold member starting in 2018 and continuing through 2023. (CAC ¶¶ 29–30.) GoodRx's records indicate that Jane Doe II signed up for a GoodRx Gold account via the GoodRx mobile application in March 2020. (Cheng Decl. ¶ 27.) In order to register for a GoodRx Gold account on her mobile device, Jane Doe II would have been presented with a page with a button located near the phrase "By continuing, you agree to GoodRx's **Terms of Service** and **Privacy Policy**." (*Id.* ¶ 32.) In order to continue to register for her account, Jane Doe II would have been required to click that button. (*Id.*) The words "Terms of Service" and "Privacy Policy" were written in blue font, alerting Jane Doe II to the fact that the terms were hyperlinked. (*Id.*)

By signing up for an account, when Jane Doe II clicked to continue, she affirmatively consented to the GoodRx TOU in effect in March 2020. (*Id.* ¶¶ 31–32, 36–37.) The GoodRx TOU in effect in March 2020 provides at its outset, in a bold section entitled "**Contractual Relationship**," that "[b]y accessing or using the Services, you confirm your agreement to be bound by these Terms, including the information set forth in our privacy policy, located here." (*Id.* ¶ 39, **Ex. 3**, Jan. 2020 TOU § 1.)

Additionally, when Jane Doe II subsequently signed into her GoodRx Gold account, which she did as recently as March 4, 2023, she would have been required to agree to GoodRx's current **Terms** and **Privacy Policy**. (*Id.* ¶¶ 33–35, 38.) On the sign-in page, the current version of which is shown below, Jane Doe II would have been prompted to enter her email, below which is the phrase, "By continuing, you agree to our **Terms** and **Privacy Policy**." (*Id.* ¶¶ 34–35.) The words "Terms" and "Privacy Policy" are underlined and in bold, blue font, which would have alerted Jane Doe II to the fact that the terms themselves were hyperlinked. (*Id.*) By signing into her account, including as recently as March 4, 2023, Jane Doe II affirmatively consented to the TOU in effect over that period of time, including the 2023 TOU.[3] (*Id.* ¶¶ 33–36, 38, 42.)




**3. Plaintiff John Doe's Use of GoodRx and Consent to GoodRx's Terms.**

Plaintiff John Doe was a GoodRx coupon user who emailed himself a coupon from GoodRx's mobile site in August 2020. (CAC ¶ 36; Cheng Decl. ¶ 47.) As shown below, the following words were displayed under the box where John Doe was prompted to type in his email address: "[b]y clicking Send, I agree to GoodRx's **Terms** and **Privacy Policy**." (Cheng Decl. ¶¶ 51–52.) The words "Terms" and "Privacy Policy" were in blue font, alerting John Doe to the fact that the terms were hyperlinked. (*Id.*) John Doe had to click "Send" to proceed. (*Id.* ¶¶ 51–53.)

[3] The 2023 TOU contains the same substantive provisions and terms as the 2020, 2021, and 2022 TOUs. (*See* Cheng Decl. ¶ 42, **Ex. 4**, 2023 TOU.)




By emailing himself the coupon, when John Doe clicked "Send," he affirmatively consented to the GoodRx TOU in effect in August 2020. (*Id.* ¶¶ 53–55.) The GoodRx TOU in effect in August 2020 provided at its outset, in a bold section entitled "**Contractual Relationship**," that "[b]y accessing or using the Services, you confirm your agreement to be bound by these Terms, including the information set forth in our privacy policy, located **here**." (*Id.* ¶ 56, **Ex. 5**, July 2020 TOU § 1.)

**4. Plaintiff Jose Marquez's Use of GoodRx and Consent to GoodRx's Terms.**

Plaintiff Jose Marquez alleges, and GoodRx's records indicate, that Marquez, using the GoodRx mobile website, signed up for a GoodRx Gold free trial in June 2021, and then cancelled his trial in July 2021 prior to paying any membership fee. (CAC ¶¶ 47–48; Cheng Decl. ¶¶ 64–66.) When creating and registering for a GoodRx Gold account on his mobile device, Marquez was required to agree to a sign-up page that said, right below where he was required to enter his information, that "[b]y continuing, I agree to [GoodRx's] **Terms of Service** and **Privacy Policy**." (Cheng Decl. ¶¶ 67–71.) The words "Terms of Service" and "Privacy Policy" were bold and in a different color font than the rest of the words, alerting Marquez to the fact that the terms were hyperlinked. (*Id.* ¶¶ 70–71.) Marquez had to click "Start Free Trial" to proceed. (*Id.*)




By signing up for an account, when Marquez clicked "Start Free Trial," he affirmatively consented to the GoodRx TOU in effect in June 2021. (*Id.* ¶¶ 67–73.) The 2021 TOU provided at its outset, in a bold section entitled "**Contractual Relationship**," that "[b]y accessing or using the Services, you confirm your agreement to be bound by these Terms, including the information set forth in our privacy policy, located **here**." (*Id.* ¶ 74, **Ex. 6**, 2021 TOU § 1.)

**C. Plaintiffs Agreed to Arbitrate *All* Claims Regarding GoodRx's Services and Waived the Right to Proceed in Any Class Action.**

Each iteration of the TOU that Plaintiffs assented to contained a broad and prominently displayed arbitration agreement and class action waiver. The arbitration agreement was substantially similar in all

versions of the TOU at issue, requiring Plaintiffs to resolve any claim against GoodRx on an individual basis in arbitration and drawing users' attention to this in bold and/or capitalized text on the first page. All the relevant arbitration agreements also contained features favorable to users to facilitate the resolution of claims, such as: the ability to pursue relief in small claims court for certain claims; application of the more flexible American Arbitration Association ("AAA") Consumer Arbitration Rules; requiring GoodRx to pay arbitration costs for certain claims; and the availability of full individual remedies, including declaratory or injunctive relief and attorneys' fees. (Cheng Decl., **Ex. 2** § 2; **Ex. 3** § 2; **Ex. 4** § 2; **Ex. 5** § 2; **Ex. 6** § 2.) The specifics of each iteration of the arbitration agreements that each Plaintiff agreed to are discussed in detail below.

### 1. Arbitration Agreement for Plaintiff Jane Doe.

As a GoodRx Care user, Plaintiff Jane Doe was required to affirmatively click a box assenting to the TOU, which contained the agreement to arbitrate. (Cheng Decl. ¶¶ 7–25.)

The first section of the 2022 TOU in force during Plaintiff Jane Doe's use stated, in bolded and capitalized font:

> **IMPORTANT: PLEASE REVIEW THE ARBITRATION AGREEMENT SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH GOODRX ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION. BY ENTERING THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION**.

(*Id.* ¶ 20, **Ex. 2** § 1 (emphasis and capitalization in original).)

The 2022 TOU had a bold section entitled "**Arbitration Agreement**" requiring Plaintiff to "***individual[ly]***" arbitrate "any dispute, claim or controversy arising out of or relating to" "these Terms" or "access to or use of the [GoodRx] Services at any time," including "any disputes relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement" and "all threshold arbitrability issues." (*Id.* ¶¶ 23–25, **Ex. 2** § 2 (emphasis in original).) Next was a bold heading entitled "**Rules and Governing Law**" that stated "[t]he arbitration will be administered by" the AAA in "accordance with" AAA Rules. (*Id.* ¶ 25, **Ex. 2** § 2.)

**2. Arbitration Agreements for Plaintiffs Jane Doe II, John Doe, and Jose Marquez.**

As a GoodRx coupon or Gold user, Plaintiffs Jane Doe II, John Doe, and Jose Marquez were required to affirmatively click a button near language that expressly stated that, by continuing or by clicking send, they agreed to the GoodRx TOU containing the arbitration agreement. (Cheng Decl. ¶¶ 32–35, 37–38, 51–55, 70–73.) Moreover, as noted above, Jane Doe II, who used her Gold account as recently as March 4, 2023, and Marquez, who used his Gold account during a three-month window in 2021, would have been required to sign in when they accessed their Gold accounts; with each sign-in, Jane Doe II and Marquez would have been required to agree (yet again) to the GoodRx TOU. (*Id.* ¶¶ 33–36, 38, 42.) The TOUs in force in March 2020 when Jane Doe II registered, in August 2020 when John Doe emailed himself a coupon, and in 2021 when Marquez registered had the same arbitration agreement and notices as the 2022 TOU described above. Namely, the first section of both the 2020 TOUs and the 2021 TOU had the same bold, all capitalized notice entitled "**IMPORTANT**" noting the "**BINDING ARBITRATION**" agreement and the "**CONSEQUENCES OF THIS IMPORTANT DECISION**." (*Id.* ¶¶ 40, 57, 75; **Ex. 3** § 1; **Ex. 5** § 1; **Ex. 6** § 1 (emphasis and capitalization in original).) Both the 2020 and the 2021 TOUs also had the same bold section entitled "**Arbitration Agreement**" as the 2022 TOU, requiring Plaintiffs to "**individual[ly]**" arbitrate "any dispute, claim or controversy arising out of or relating to" "these Terms" or "access to or use of the [GoodRx] Services at any time," including "any disputes relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement" and "all threshold arbitrability issues." (*Id.* ¶¶ 44–46, 60–62, 78–80; **Ex. 3** § 2; **Ex. 5** § 2; **Ex. 6** § 2 (emphasis in original).) And following that is the same notice that "the arbitration will be administered by" the AAA "in accordance with" AAA Rules. (*Id.* ¶¶ 46, 62, 80; **Ex. 3** § 2; **Ex. 5** § 2; **Ex. 6** § 2.)

**D. Despite Agreeing to Arbitrate Their Claims Individually, Plaintiffs Nevertheless Filed Suit on Behalf of A Putative Class.**

Notwithstanding Plaintiffs' agreement to arbitrate "any claim that [they] may have against GoodRx on an individual basis in arbitration" (Cheng Decl. ¶¶ 23, 42, 44, 60, 78, **Ex. 2** at § 2; **Ex. 3** § 2;

**Ex. 4**; **Ex. 5** § 2; **Ex. 6** § 2), Plaintiffs filed complaints in the Northern District of California in February and March of 2023 and a Consolidated Class Action Complaint on May 26, 2023. (ECF No. 102.) Plaintiffs purport to represent a nationwide class, and in the alternative various state classes, of all GoodRx users whose communications and/or data were shared with third parties. (CAC ¶ 219.) GoodRx informed Plaintiffs that it intended to move to compel arbitration in light of the binding arbitration agreements that each Plaintiff has with GoodRx. Plaintiffs did not withdraw their Complaint. Accordingly, GoodRx moves this Court to compel each Plaintiff to arbitration.

## III. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, courts are "require[d] … to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement." *SST Millennium LLC v. Mission St. Dev. LLC*, 2019 WL 2342277, at *2 (N.D. Cal. June 3, 2019) (citing 9 U.S.C. § 3). The FAA also provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The GoodRx TOU is subject to the FAA, as it is a written contract "evidencing a transaction involving commerce." *Id.*; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

When the parties to a suit have entered into an arbitration agreement, the FAA "leaves no place for the exercise of discretion by a district court" as to whether to "direct the parties to proceed to arbitration on issues as to which [that] arbitration agreement" applies. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (internal quotations omitted). Rather, in the face of an arbitration agreement, the Court's role is generally limited to the consideration of two "gateway" issues: first, "whether a valid agreement to arbitrate exists"; and second, "whether the agreement encompasses the dispute at issue." *Id.*; *see also Oberstein*, 60 F.4th at 510 (quoting *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004)). If the answers to those questions are "yes," then the Court "shall make an order directing the parties to proceed to arbitration." 9 U.S.C. § 4.

However, "[t]he presence of a delegation clause"—*i.e.*, a clause that delegates to the arbitrator gateway questions of arbitrability, such as enforceability or scope—"further limits the issues that a court may decide." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). Where the

parties have clearly and unmistakably "agreed to arbitrate arbitrability," then the Court must compel arbitration without addressing questions regarding the enforceability or scope of the agreement. In that case, the remaining gateway questions of arbitrability are for the arbitrator, not the Court, to decide. *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Indeed, "a valid … delegation clause commits to the arbitrator nearly all challenges to an arbitration provision." *Id.*

Once the Court is satisfied an agreement exists and the parties agreed to arbitrate "gateway" questions of arbitrability, it must compel arbitration. *Id.* at 1030. Thus, the only questions for this Court to decide are whether the parties formed an agreement to arbitrate and whether that agreement included a delegation clause. *See Pearl v. Coinbase Global, Inc.*, 2023 WL 1769190 (N.D. Cal. Feb. 3, 2023).

## IV. ARGUMENT

Each Plaintiff entered into a binding arbitration agreement with GoodRx, which delegated all "gateway" questions of arbitrability to the arbitrator. Indeed, each Plaintiff agreed to GoodRx's TOU by checking or clicking a box that clearly indicated such assent. GoodRx's TOU require Plaintiffs "to resolve disputes with GoodRx on an individual basis through final and binding arbitration." (Cheng Decl. ¶¶ 20, 40, 42, 57, 75, **Ex. 2** § 1; **Ex. 3** § 1; **Ex. 4**; **Ex. 5** § 1; **Ex. 6** § 1.) The arbitration agreement in the TOU also included a delegation provision, which expressly delegates "gateway" questions of arbitrability to the arbitrator." (*Id.* ¶¶ 25, 42, 46, 62, 80, **Ex. 2** § 2; **Ex. 3** § 2; **Ex. 4**; **Ex. 5** § 2; **Ex. 6** § 2.) Thus, this Court must compel arbitration and send any remaining gateway questions of arbitrability to the arbitrator. But even if this Court were to disregard the delegation provision and decide the remaining gateway questions itself, it should compel arbitration of Plaintiffs' claims here because the agreement is enforceable and Plaintiffs' claims fall within its scope.

### A. Plaintiffs and GoodRx Entered into A Valid and Binding Agreement to Arbitrate.

Arbitration is fundamentally a matter of contract. "To determine whether a valid arbitration agreement exists, federal courts apply ordinary state-law principles that govern the formation of contracts." *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 483 (9th Cir. 2020) (internal quotations and citations omitted). "To form a contract under California … law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Oberstein*, 60 F.4th at 512–13.

Here, Plaintiffs were provided notice of GoodRx's TOU and manifested assent to those terms by way of a classic "clickwrap" or "sign-in wrap" agreement. A clickwrap agreement is one "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Dohrmann*, 823 F. App'x at 483. A "sign-in wrap" agreement is one in which a website notifies "the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise[s] the user that he or she is agreeing to the terms of service when registering or signing up." *Peter v. DoorDash*, 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020). Plaintiffs here were prompted to check a box saying "I agree to the **Terms** . . ." or click a button (near which GoodRx stated that, by doing so, the user would manifest agreement to the Terms) before they could sign up for a GoodRx account, sign into an existing GoodRx account, or email themselves a coupon. (Cheng Decl. ¶¶ 11–12, 32, 34–35, 51–52, 70–71.) The full text of the TOU was accessible via a different color font hyperlink. (*Id.*) The agreement thus constituted a classic "clickwrap" or "sign-in wrap" agreement. And "[c]ourts routinely find clickwrap [and sign-in wrap] agreements enforceable." *Oberstein*, 60 F.4th at 513; *id.* at 514 ("clickwrap represents the clearest manifestations of assent and is certainly the easiest method of ensuring the terms are agreed to" (internal quotations omitted)); *Lee v. Ticketmaster LLC*, 2019 WL 9096442, at *1 (N.D. Cal. Apr. 1, 2019), *aff'd*, 817 F. App'x 393 (9th Cir. 2020) (finding valid contract where, even though "Lee was not required to check a separate box to indicate his assent[,]" "Ticketmaster provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in a contrasting color, and informed the user that 'continuing past this page' (*i.e.*, placing an order) would indicate assent to the terms"); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011) (finding valid contract where plaintiffs were "provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the [sign up or sign in] button[s] and [they] clicked [sign up or sign in]" and accepted the terms of the agreement).

Indeed, here, there can be no doubt that Plaintiffs agreed to "an enforceable agreement," because: (1) GoodRx provided "reasonably conspicuous notice of the terms to which the consumer will be bound"; and (2) each Plaintiff took "some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Oberstein*, 60 F.4th at 515 (internal quotations omitted).

Specifically, each Plaintiff was provided reasonably conspicuous notice of GoodRx's TOU. In order to sign up for a GoodRx Care account, Jane Doe had to check a box next to the words "I agree to the **Terms, Privacy Policy** and **Telehealth Consent**" and then click a *separate* "Start Your Visit" button. (Cheng Decl. ¶¶ 11–14.) The words "Terms," "Privacy Policy," and "Telehealth Consent" were in bold, blue font, which reasonably alerted Plaintiff Jane Doe to the fact that those terms were hyperlinked to the full text of the terms and policies to which Plaintiff agreed. (*Id.* ¶¶ 12, 14.) In order for John Doe to email himself a coupon and for Marquez and Jane Doe II to sign up for or sign into a GoodRx Gold account, they were all required to click a button right above, below, or near a notification that stated that "[b]y clicking Send" or "[b]y continuing" you "agree to [GoodRx's] **Terms** and **Privacy Policy**." (*Id.* ¶¶ 30–32, 35, 51–52, 70–71.) The words "Terms" and "Privacy Policy" were offset and in a different color font, which reasonably alerted Plaintiffs John Doe, Marquez, and Jane Doe II to the fact that those terms were hyperlinked to the full text of the terms and policies to which Plaintiffs agreed. (*Id.*) The Ninth Circuit has recognized that blue or different color font is a "[c]ustomary design element[] denoting the existence of a hyperlink" which "can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Oberstein*, 60 F.4th at 516 (internal citation omitted) (considering the totality of the circumstances and "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design"); *see also DoorDash*, 445 F. Supp. 3d at 586 (finding contract was formed where terms-of-use hyperlink appeared "directly below" the "sign-up button," its text "contrast[ed] clearly with the background" and was "plainly readable"). By clicking on that link, Plaintiffs could read the full TOU and decide whether or not they agreed to those terms. (Cheng Decl. ¶¶ 12–17, 32–38, 51–55, 70–73.)

That the full text of the TOU was not on the same page on which Plaintiffs agreed to them is of no matter. "[C]ourts have long upheld contracts where 'the consumer is prompted to examine terms of sale that are located somewhere else.'" *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014) (internal citation omitted); *see also Swift*, 805 F. Supp. 2d at 911–12. This Court need not depart from that precedent. The GoodRx website and platform provided Plaintiffs with constructive notice of the terms of their use.

Next, Plaintiffs also each clearly assented to GoodRx's TOU. "[C]ourts analyze mutual assent [as for any online agreement] under an objective-reasonableness standard." *Oberstein*, 60 F.4th at 513; *see id.* at 517 ("Although mutual assent is generally a question of fact, whether a certain set of facts is sufficient to establish a contract is a question of law." (citing *Long v. Provide Commerce, Inc.*, 245 Cal.App.4th 855, 200 Cal. Rptr. 3d 117, 123–24 (2016))). When the "user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement" and the user "click[s] … a button," that button is "an unambiguous manifestation of assent." *Id.* at 515 (internal citation omitted). For example, in *Oberstein*, the Ninth Circuit explained, if a website "explicitly alert[s] the user that by creating an account . . . [or] signing in . . . and proceeding to the next page, the user 'agrees to our Terms of Use[,]'" the assent requirement is satisfied. *Id.* at 517.

Here, Plaintiffs either checked a box that said, in bold, blue letters, "I agree to the **Terms, Privacy Policy** and **Telehealth Consent**" or clicked a button that said in offset, blue or gold letters that "[b]y clicking Send" or "[b]y continuing" you "agree to [GoodRx's] **Terms** and **Privacy Policy**." (Cheng Decl. ¶¶ 12–14, 32–35, 51–52, 70–71.) That is enough to show assent. *See Tompkins*, 2014 WL 2903752, at *8 (finding plaintiff assented to the terms of service where, "during the account creation and registration processes, each named Plaintiff clicked a box or button that appeared near a hyperlink to the TOS to indicate acceptance of the TOS"). Plaintiffs thus agreed to the arbitration provision that was clearly and conspicuously laid out in GoodRx's TOU. *See Alfia v. Coinbase Global, Inc.*, 2022 WL 3205036, at *2 (N.D. Cal. July 22, 2022) ("Plaintiff[] . . . clicked a box stating that he agreed to the User Agreement, which was hyperlinked for easy accessibility . . . He had clear notice of the terms of the 2017 User Agreement and took physical action to manifest his assent . . . Therefore … the parties entered into a binding arbitration agreement."); *B.D. Blizzard Ent., Inc.*, 76 Cal.App.5th 931, 943 (2022) ("If an offeree objectively manifests assent to an agreement, the offeree cannot avoid a specific provision of that agreement on the ground the offeree did not actually read it."); *Peterson*, 2018 WL 6047085, at *2 ("Mr. Peterson's clicking of the 'I accept' button rendered the Lyft Terms of Service a binding contract between him and Lyft . . . It is thus enforceable according to its terms.").

### B. The GoodRx Terms Clearly and Unmistakably Delegate Questions of Arbitrability to the Arbitrator.

The arbitration agreements between GoodRx and Plaintiffs include a delegation clause. "A delegation clause is a clause within an arbitration provision that delegates to the arbitrator gateway questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all." *Caremark*, 43 F.4th at 1029 (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). That agreement to arbitrate gateway issues (*i.e.*, to delegate such issues to an arbitrator) is "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce." *Rent-A-Center*, 561 U.S. at 70. "[T]he FAA operates on this [delegation provision, which is simply an] additional arbitration agreement[,] just as it does on any other." *Id.* If the parties' arbitration agreement contains a delegation clause that "*clearly and unmistakably*" delegates threshold questions to the arbitrator, *Peterson*, 2018 WL 6047085, at *2, "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Caremark*, 43 F.4th at 1030. Indeed, "a valid . . . delegation clause commits to the arbitrator nearly all challenges to an arbitration provision." *Id.* at 1029.

Here, the agreements between Plaintiffs and GoodRx include a clear and unmistakable agreement to delegate threshold arbitrability questions for two independent, sufficient reasons. First, the terms of the agreement include an explicit and unambiguous delegation provision:

> The parties agree that the arbitrator ("Arbitrator"), and not any federal, state, or local court or agency, shall have exclusive authority to resolve any disputes relating to the interpretation, ***applicability, enforceability or formation of this Arbitration Agreement***, including any claim that all or any part of this Arbitration Agreement is void or voidable. The Arbitrator shall also be responsible for determining ***all threshold arbitrability issues,*** including issues relating to whether the Terms are unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, or estoppel.

(Cheng Decl. ¶¶ 25, 42, 46, 62, 80, **Ex. 2** § 2; **Ex. 3** § 2; **Ex. 4**; **Ex. 5** § 2; **Ex. 6** § 2 (emphasis added).)

Second, even if the agreement were not clear on its face, it incorporates the AAA rules, which themselves provide that the arbitrator decides threshold questions of arbitrability. (*Id.* ("The arbitration will be administered by the American Arbitration Association ('AAA') in accordance with the AAA's

Consumer Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the 'AAA Rules') then in effect, except as modified by this Arbitration Agreement.").) The AAA rules say that the arbitrator—not the Court—has "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Consumer Arbitration Rule R-14 (amended and effective Sept. 1, 2014), available online at: https://adr.org/sites/default/files/Consumer%20Rules.pdf.

Courts routinely hold that incorporation of the AAA rules constitutes "clear and unmistakable" evidence the parties intended to delegate threshold questions of arbitrability to the arbitrator. *See, e.g.*, *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *Aanderud v. Superior Court*, 13 Cal. App. 5th 880, 892–93 (2017) ("An arbitration provision's reference to, or incorporation of, arbitration rules that give the arbitrator the power or responsibility to decide issues of arbitrability may constitute clear and unmistakable evidence the parties intended the arbitrator to decide those issues."); *Oracle Am. Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) ("Virtually every circuit to have considered the issue has determined that incorporation of the American Arbitration Association's (AAA) arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").

Thus, the parties here clearly and unmistakably delegated threshold questions of arbitrability to the arbitrator. GoodRx's TOU—which Plaintiffs assented to—contains an express delegation clause and, on top of that, incorporated the AAA rules. As such, this Court "shall" refer all remaining questions of arbitrability to the arbitrator. 9 U.S.C. § 2; *see Brennan*, 795 F.3d at 1132 ("[A] court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator[.]").

### C. The Arbitration Agreement Is Valid, Enforceable, and Encompasses Plaintiffs' Claims.

Because the arbitration agreement includes a delegation clause, the remaining threshold questions of arbitrability—such as whether the agreement is enforceable or whether Plaintiffs' claims fall within the scope of the arbitration agreement—are for the arbitrator, not this Court, to decide. *See Oberstein*, 60 F.4th at 510 ("Upon being satisfied of the existence of a valid arbitration agreement, the court must order the parties to proceed to arbitration in accordance with the terms of the agreement." (citing 9 U.S.C. § 4));

*see also Aanderud*, 13 Cal.App.5th at 897 ("[I]t is up to the arbitrator to determine whether this dispute is arbitrable[.]"); *Rent-A-Center*, 561 U.S. at 72 (absent a specific challenge to the delegation provision, courts "must treat it as valid under § 2, and must enforce it under" the FAA). But even if this Court were to reach those questions itself, it should still compel arbitration of Plaintiffs' claims against GoodRx.

To the extent Plaintiffs challenge the enforceability or applicability of the arbitration agreements, Plaintiffs bear the burden of showing as much. *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."); *Peterson*, 2018 WL 6047085, at *4 ("As the party opposing arbitration, Mr. Peterson has the burden of proving unconscionability."). This, they cannot do.

**1. The Arbitration Agreement Is Presumptively Valid and Enforceable.**

An arbitration agreement governed by the FAA (such as this one) is presumptively "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. As explained above, the clickwrap agreement here fits squarely within the long line of cases the Ninth Circuit has found to be valid and enforceable, as the agreement provided Plaintiffs with sufficient notice of its terms, and Plaintiffs clearly assented to the terms of the arbitration agreement.

**2. Plaintiffs' Claims Fall Within the Scope of the Arbitration Agreement.**

Plaintiffs and GoodRx expressly agreed to a broad arbitration provision, which provided that:

> You [Plaintiff] and GoodRx agree that any dispute, claim or controversy arising out of or relating to (a) these Terms or the existence, breach, termination, enforcement, interpretation, or validity thereof, or (b) your access to or use of the Services at any time, whether before or after the date you agreed to the Terms, will be settled by binding arbitration between you and GoodRx, and not in a court of law.

(Cheng Decl. ¶¶ 24, 42, 45, 61, 79, **Ex. 2** § 2; **Ex. 3** § 2; **Ex. 4**; **Ex. 5** § 2; **Ex. 6** § 2.)

The parties also expressly agreed to "waiv[e] the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding." (*Id.* ¶¶ 24, 42, 45, 61, 79, **Ex. 2** § 2; **Ex. 3** § 2; **Ex. 4**; **Ex. 5** § 2; **Ex. 6** § 2.) The only exceptions to the arbitration agreement were that Plaintiffs and GoodRx "each retain[ed] the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade

secrets, patents or other intellectual property rights." (*Id.*) Those exceptions plainly do not apply to the claims at issue in this case.

District courts in this Circuit—as well as the Ninth Circuit itself—have held that "an agreement that requires the parties to arbitrate 'any dispute arising out of or relating to' an agreement is intended 'to reach all aspects of their relationship.'" *Neurosigma, Inc. v. De Salles*, 2014 WL 12803168, at *3 (C.D. Cal. Jan. 31, 2014) (quoting *Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006)). Such is the case here. The agreement between Plaintiffs and GoodRx was sufficiently broad to reach Plaintiffs' claims against GoodRx. All of Plaintiffs' claims arise out of or relate to Plaintiffs' alleged use of the GoodRx platform and the services GoodRx allegedly provided to Plaintiffs. Moreover, all of Plaintiffs' claims arise out of GoodRx's alleged use of the information that Plaintiffs provided when they used its website and services. Thus, the agreement at issue here encompasses Plaintiffs' claims.

### D. Plaintiffs' New Request for a Public Injunction Does Not Relieve Them of Their Obligations to Arbitrate Their Claims Individually.

Because Plaintiffs affirmatively consented to GoodRx's TOU and arbitration agreement, the class action waiver contained therein applies and prohibits litigating their claims as a class action, full stop. Any attempt by Plaintiffs to avoid this fate based on their newly-pled public injunctive relief theory—raised for the first time in their Consolidated Class Action Complaint (after GoodRx informed Plaintiffs of its intent to move to compel arbitration)—would fail on multiple fronts. (CAC ¶¶ 212–18.)

As a preliminary matter, whether a party who seeks public injunctive relief can be compelled to arbitration is a threshold issue to be decided by the arbitrator. (*See, e.g.*, Cheng Decl. ¶¶ 25, 42, 46, 62, 80, **Ex. 2** § 2; **Ex. 3** § 2; **Ex. 4**; **Ex. 5** § 2; **Ex. 6** § 2 (requiring Plaintiffs to arbitrate any disputes relating to the TOU or use of GoodRx's services, including "any disputes relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement" and "all threshold arbitrability issues")); *see also Lee v. Postmates Inc.*, 2018 WL 4961802, at *10 (N.D. Cal. Oct. 15, 2018) (plaintiff "likely can and must arbitrate her claim for public injunctive relief, but at the very least must submit to the arbitrator the question of whether a claim for such relief falls within the arbitrator's authority").

Accordingly, this Court need not consider any argument by Plaintiffs regarding the enforceability of the arbitration provision on these grounds.

But even if this Court could consider this issue, this is a private dispute among GoodRx and its users, where the thrust of Plaintiffs' case is their desire—though unfounded—for monetary damages. Plaintiffs seek statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as disgorgement of profits allegedly obtained by GoodRx as a result of the purported conduct. (*See* CAC ¶¶ 243–45, 270, 279, 286, 292, 319, 343, 360, 367, 373, 387, 396, Prayer for Relief.) Of course, GoodRx does not concede that ***any*** damages or relief is warranted here. But critically, for purposes of compelling arbitration, Plaintiffs cannot possibly explain how a private dispute between GoodRx and its ***users—not*** the general public—can be elevated to one for "public injunctive relief," particularly where, as here, any purported injunctive relief would be "merely incidental" to their primary goal: to receive money damages. *Ajzenman v. Office of the Commissioner of Baseball*, 2020 WL 6037140, at *6–7 (C.D. Cal. Sept. 14, 2020); *see Johnson v. JP Morgan Chase Bank, N.A.*, 2018 WL 4726042, at *6 (C.D. Cal. Sept. 18, 2018) ("Merely requesting relief which would generally enjoin a defendant from wrongdoing does not elevate requests for injunctive relief to requests for <u>public</u> injunctive relief."); *see also Hodges v. Comcast Cable Commc'ns*, 21 F.4th 535, 542 (9th Cir. 2021) (distinguishing between private injunctive relief, which "provides benefits to . . . a *group of individuals similarly situated* to the plaintiff"—*i.e.*, subscribers to the defendant's services—and public injunctive relief, which "involves diffuse benefits to the 'general public' as a whole, and the general public 'fails to meet' the class-action requirement of 'an ascertainable class'" (internal citations omitted)).

Moreover, as a practical matter, Plaintiffs seek damages to remedy an alleged harm that they allege occurred solely in the past and that is not, in any way, continuing into the future. Plaintiffs concede that the February 2023 FTC resolution in the matter that formed the basis of this follow-on suit, already included "tak[ing] certain corrective actions to prevent the disclosure of additional users' PII and health information, including ceasing the use of health information for advertising purposes and further misrepresenting its disclosure of health information" and "notif[ying] users via email and through a '2023 Notice' posted on its website of its settlement with the FTC"—the same injunctive relief Plaintiffs request

here. (CAC ¶¶ 196–97.) Thus, it is clear that Plaintiffs' attempt to tack on a request for public injunctive relief does not actually seek to avoid any "future injury," but rather is a misplaced attempt to avoid being compelled to arbitrate their claims. In such circumstances, a party cannot avoid arbitration. *See McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017) (stating public injunctive relief is limited to "prohibiting unlawful acts that threaten *future injury* to the general public") (emphasis added). Indeed, Plaintiffs do not allege ***any*** future harm will occur to them or the public at-large, nor could they: Plaintiffs concede the conduct and practices alleged (to the extent they ever occurred) have "ceas[ed]." (CAC ¶¶ 196–97.) The Court should therefore ignore Plaintiffs' strategic and insufficient pleading tactics. *See Sponheim v. Citibank, N.A.,* 2019 WL 2498938, at *4–5 (C.D. Cal. June 10, 2019) (compelling arbitration despite purported public injunctive relief claims where "primary aim" of plaintiff's suit was to "gain[] compensation for injury for himself and others similarly situated").

**E. This Action Should Be Dismissed or Stayed.**

If a "motion to compel arbitration is granted, litigation will proceed in an arbitral forum, not in this Court." *Stiener v. Apple Computer, Inc.*, 2007 WL 4219388, at *1 (N.D. Cal. Nov. 29, 2007). Once it compels arbitration, this Court may either dismiss or stay the current action pending completion of the arbitration proceedings. *See Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 966 (N.D. Cal. 2015) ("Because the Court concludes that arbitration should be compelled, it has the discretion to stay the case under 9 U.S.C. § 3 or dismiss the litigation entirely."); *see also Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 638 (9th Cir. 1988) (affirming the district court's dismissal of an action referable to arbitration). In *Peterson v. Lyft, Inc.*, the Court compelled arbitration and dismissed the case, reasoning that "[n]either side ha[d] presented any compelling reason to keep this case on the Court's docket." 2018 WL 6047085, at *6 (N.D. Cal. Nov. 19, 2018). Here, too, dismissal is appropriate.[4]

[4] When an agreement calls for arbitration in a forum other than the one in which plaintiffs brought suit, courts often order the parties to arbitrate in the district in which the motion to compel was filed, citing the Ninth Circuit's decision in *Textile Unlimited, Inc. v. A..BMH & Company*, 240 F.3d 781, 785 (9th Cir. 2001), which stated, "[B]y its terms, § 4 only confines the *arbitration* to the district in which the petition to compel is filed. It does not require that the petition be filed where the contract specified that arbitration should occur." *See, e.g.*, *Cabot Creekside 8 LLC v. Cabot Inv. Props., LLC*, 2011 WL 13223878, at *20 (C.D. Cal. Apr. 21, 2011) ("[N]umerous courts have held that although a court cannot compel arbitration outside its district, an order compelling arbitration within its district is an adequate alternative."); *see, e.g.*, *Bencharsky v. Cottman Transmission Sys., LLC*, 625 F. Supp. 2d

If the Court, however, does not dismiss the action, the FAA instructs that a stay must be issued. 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."). As at least one court in this Circuit has recognized: "[t]he plain language of the FAA seems to require that, if 'any issue' is referred to arbitration, the court 'shall' stay ***the 'action'*** pending arbitration upon request. . . . The statute compels staying the entire action and leaves no room to stay certain claims and proceed with or dismiss others." *Lovig v. Best Buy Stores LP*, 2019 WL 2568851, at *3 (N.D. Cal. June 21, 2019) (emphasis added). As discussed below, a stay of the entire action is warranted here. At minimum, the Court must stay this case as to the Plaintiffs compelled to arbitrate their claims. *See Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 990 (N.D. Cal. 2016); *see also* 9 U.S.C. § 3.

Here, a stay of the entire action—including as to any plaintiffs who are not subject to arbitration agreements—makes good sense.[5] Such a stay would promote efficiency and prevent unnecessary

872, 883–84 (N.D. Cal. 2018) (ordering arbitration in California despite contractually designated forum of Pennsylvania); *Larson v. Speetjens*, 2006 WL 3365589, at *5 (N.D. Cal. Nov. 17, 2006) (ordering arbitration in California despite contractually designated forum of Mississippi). This makes good sense here, as well, particularly given that Plaintiffs invoked the jurisdiction of this Court. *See Continental Grain Co. v. Dant & Russell, Inc.*, 118 F.2d 967, 968–69 (9th Cir. 1941) ("The [party], having invoked the jurisdiction of the [Northern District of California,] is hardly in a position to complain that it has exercised that jurisdiction in accordance with the statute giving it jurisdiction."). In the alternative, some courts, citing Section 4 of the FAA, have dismissed the action altogether rather than compelling arbitration. *See Dwyer v. Dynetech Corp.*, 2007 WL 2726699, at *6 (N.D. Cal. Sept. 17, 2007) (dismissing action without compelling arbitration); *Puri v. Golden Temple of Oregon, LLC*, 2010 WL 11595757, at *3–4 (C.D. Cal. June 9, 2010) (dismissing claims "because all of [p]laintiff's claims are arbitrable[,]" but declining to compel arbitration in another district).

[5] In addition, GoodRx understands that other Defendants may move to compel arbitration. However, if any claims against any Defendants are not compelled to arbitration, "economy and efficiency" counsel that such claims should be stayed as well. *Asimil Holdings Ltd. v. Carium Capital Mgmt. LLC*, 622 F.Supp.2d 825, 842 (N.D. Cal. 2007) (failure to stay as to all defendants would prejudice arbitrating defendant's right to arbitration and "[c]onsiderations of economy and efficiency" counseled in favor of a stay). *See also Newton v. Neumann Caribbean Int'l, Ltd.,* 750 F.2d 1422, 1427 (9th Cir. 1985) (where there is substantial overlap in the claims as to signatories and non-signatories, considerations of economy and efficiency support a stay).

complexity for discovery and case management; for instance, proceeding with the litigation before the arbitrator has even decided whether some of the putative class members' disputes are arbitrable would "create real uncertainty regarding issues relating to class certification and representation, as well as create unnecessary complexity for discovery and case management." *Forsyth v. HP Inc.*, 2018 WL 732722, at *7 (N.D. Cal. Feb. 6, 2018); *see also U.S. for Use and Benefit of Newton v. Neumann Caribbean Int'l, Ltd.*, 750 F.2d 1422, 1427 (9th Cir. 1985) ("Considerations of economy and efficiency fully support the District Court's determination that the third party claim and other matters must await the final determination made in connection with the arbitration."). And as another court within this Circuit has recognized, a stay of the entire case "could avoid a situation in which the non-arbitration Plaintiffs and the arbitration Plaintiffs are treated differently solely on the basis of whether they signed an arbitration agreement when the underlying facts giving rise to their claims against [the defendant] are the same." *Lee v. Tesla, Inc.*, 2020 WL 10573281, at *10 (C.D. Cal. Oct. 1, 2020). This logic applies equally here.

## V. CONCLUSION

For the foregoing reasons, Defendant GoodRx respectfully requests that the Court grant its motion to compel arbitration of all the claims in the Consolidated Class Action Complaint brought by Plaintiffs Jane Doe, Jane Doe II, John Doe, and Jose Marquez. Further, GoodRx seeks an order dismissing this litigation as to those Plaintiffs and staying the remaining case pending resolution of the arbitrations or, in the alternative, staying this litigation pending resolution of the arbitrations.

DATED: June 9, 2023

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Martin L. Roth*

Martin L. Roth

Michael J. Shipley (SBN 233674)
mshipley@kirkland.com
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Olivia Adendorff (admitted *pro hac vice*)
olivia.adendorff@kirkland.com
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 74205
Telephone: (214) 972-1758
Facsimile: (214) 972-1771

Martin L. Roth (admitted *pro hac vice*)
martin.roth@kirkland.com
Alyssa C. Kalisky (admitted *pro hac vice*)
alyssa.kalisky@kirkland.com
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Defendant*
*GoodRx Holdings, Inc.*

**CERTIFICATE OF SERVICE**

On June 9, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF. All copies of documents required to be served by Fed. R. Civ. P. 5(a) and Civil L.R. 5-1 have been so served.

*/s/ Martin L. Roth*

Martin L. Roth