Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
Rachel Kesten (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com

L. Timothy Fisher (SBN 191626)
Jenna L. Gavenman (SBN 348510)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:    (925) 300-4455
Facsimile:    (925) 407-2700
ltfisher@bursor.com
jgavenman@bursor.com

*Additional Counsel for Plaintiffs on
Signature Page*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE, JANE DOE II, JOHN DOE, E.C., JOSE MARQUEZ, and HOLLIS WILSON, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>GOODRX HOLDINGS, INC., CRITEO CORP., META PLATFORMS, INC., and GOOGLE LLC.,<br><br>    Defendants. | Case No. 3:23-cv-00501-AMO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND/OR STAY**<br><br>Complaint Filed: May 26, 2023<br>Hearing Date: September 14, 2023<br>Time: 2:00 PM<br>Location: Courtroom 10, 19th Floor<br>Judge: Honorable Araceli Martinez-Olguin |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................II

I.      INTRODUCTION.................................................................................................1

II.     STATEMENT OF THE ISSUES ........................................................................3

III.    BACKGROUND..................................................................................................3

IV.     LEGAL STANDARD .........................................................................................10

V.      ARGUMENT.......................................................................................................11

    A.   Plaintiffs E.C.'s and Wilson's Claims Should Proceed at a Minimum...................11

    B.   GoodRx Cannot Show Mutual Manifestation of Assent to Arbitrate....................15

       1.   Plaintiffs Jane Doe II and John Doe Were Not Properly
             Notified of Changes in TOUs And Had No Duty to Inquire.....................19

       2.   Plaintiff John Doe Was Not On Inquiry Notice.........................................22

       3.   Plaintiff Marquez Was Not On Inquiry Notice ..........................................26

       4.   Plaintiff Jane Doe II Was Not On Inquiry Notice......................................29

       5.   GoodRx Has Not Established Assent for Any Plaintiff ..............................30

    C.   GoodRx's Arbitration & Delegation Clauses Are Unconscionable ......................31

       1.   The Arbitration & Delegation Clauses Are Procedurally
             Unconscionable ..........................................................................................32

       2.   The Arbitration & Delegation Clauses Are Substantively
             Unconscionable ..........................................................................................34

    D.   GoodRx's Arbitration Provisions Are Not Enforceable Under the
         *McGill* Rule ........................................................................................................35

VI.     THE ADVERTISING AND ANALYTICS DEFENDANTS' MOTIONS
        SHOULD BE DENIED ........................................................................................38

    A.   Plaintiffs E.C. and Wilson's Claims Against the Advertising and
         Analytics Defendants Should Proceed Irrespective of the Motions to
         Compel Arbitration ..............................................................................................38

    B.   Google and Criteo Have Not Made Substantive Arguments to
         Compel Arbitration ..............................................................................................38

    C.   Equitable Estoppel Does Not Apply......................................................................39

       1.   Plaintiffs' Claims Do Not Rely on and Are Not Intimately
             Founded in or Intertwined with GoodRx TOUs........................................39

       2.   Defendants' Misconduct Are not Interdependent and Are Not
             Intimately Connected with GoodRx's TOUs.............................................41

VII.    PLAINTIFFS' CLAIMS SHOULD NOT BE STAYED AS TO NON-
        GOODRX DEFENDANTS...................................................................................42

VIII.   CONCLUSON .....................................................................................................44

i

# TABLE OF AUTHORITIES

*Alfia v. Coinbase Global, Inc.*,
  No. 21-cv-08689, 2022 WL 3205036 (N.D. Cal. July 22, 2022)...........................................21, 25

*Aliff v. Vervent, Inc.*,
  No. 20-cv-00697, 2020 WL 5709197 (S.D. Cal. Sept. 24, 2020).......................................39, 41

*Almaznai v. S-L Distribution Co., LLC*,
  No. 20-CV-08487-JST, 2021 WL 4457025 (N.D. Cal. July 22, 2022)....................................35

*B.D. v. Blizzard Ent., Inc.*,
  76 Cal. App. 5th 931 (2022)...................................................................19, 21, 26

*Belyea v. GreenSky, Inc.*,
  No. 20-CV-01693, 2020 WL 3618959 (N.D. Cal. July 2, 2020) ....................................30, 35

*Berman v. Freedom Fin. Network, LLC*,
  No. 18-cv-01060, 2018 WL 2865561 (N.D. Cal. June 11, 2018) ......................................10

*Berman v. Freedom Financial Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ........................................... 15, 16, 24, 28, 29

*Bielski v. Coinbase, Inc.*,
  No. C 21-07478 WHA, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022)....................................34

*Blair v. Rent-A-Ctr., Inc.*,
  928 F.3d 819 (9th Cir. 2019) ...................................................................35, 37

*Bold Ltd. v. Rocket Resume, Inc.*,
  No. 22-CV-01045-BLF, 2023 WL 4157626 (N.D. Cal. June 22, 2023) ............ 11, 12, 14, 27, 28

*Burzdak v. Universal Screen Arts, Inc.*,
  No. 21-CV-02148-EMC, 2021 WL 3621830 (N.D. Cal. Aug. 16, 2021)............................10. 35

*California Crane Sch., Inc. v. Google LLC*,
  621 F. Supp. 3d 1024 (N.D. Cal. 2022)...................................................12, 43, 44

*Chen v. Bank of Am., N.A.*,
  No. CV 19-6941-MWF (SK), 2020 WL 4561658 (C.D. Cal. Mar. 31, 2020).....................12, 14

*Colgate v. JUUL Labs, Inc.*,
  402 F. Supp. 3d 728 (N.D. Cal. 2019)....................................................24, 25

*Comer v. Micor, Inc.*,
  436 F.3d 1098 (9th Cir. 2006)........................................................... 39

*Congdon v. Uber Techs., Inc.*,
  226 F. Supp. 3d 983 (Dec. 8, 2016)........................................... 11, 12, 13, 14

ii

*Cox v. Ocean View Hotel Corp.*,
    533 F.3d 1114 (9th Cir. 2008) ........................................................................ 10

*Cullinane v. Uber Techs., Inc.*,
    893 F.3d 53 (1st Cir. 2018) ............................................................................. 24

*Doe v. Massage Envy Franchising, LLC*,
    87 Cal. App. 5th 23 (Ct. App. 2022) ............................................................... 19

*Dohrmann v. Intuit, Inc.*,
    823 F. App'x 482 (9th Cir. 2020) ...............................................................21, 26

*Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*,
    495 F.3d 1062 (9th Cir. 2007) ........................................................................ 21

*Durruthy v. Charter Commc'ns, LLC*,
    No. 20-CV-1374-W-MSB, 2020 WL 6871048 (S.D. Cal. Nov. 23, 2020) .............................. 33

*Eiess v. USAA Fed. Sav. Bank*,
    404 F. Supp. 3d 1240 (N.D. Cal. 2019) .......................................................10, 35

*Ferrari v. Mercedes Benz USA, LLC*,
    No. 17-cv-00018, 2018 WL 3399320 (N.D. Cal. Jan. 18, 2018) ......................11, 12

*Forsyth v. HP Inc.*,
    No. 5:16-cv-04775, 2018 WL 732722 (N.D. Cal. Feb. 6, 2018) ........................ 14

*Gray v. Seui*,
    No. 20-CV-0198, 2020 WL 12228937 (N.D. Cal. Aug. 5, 2020) ....................... 11

*Hill v. Quicken Loans Inc.*,
    No. EDCV190163, 2020 WL 5358394 (C.D. Cal. Aug. 5, 2020) .....................18, 30

*In re Carrier IQ, Inc. Consumer Priv. Litig.*,
    No. C-12-MD-2330, 2014 WL 1338474 (N.D. Cal. Mar. 28, 2014) ....................... 40

*In re Henson*,
    869 F.3d 1052 (9th Cir. 2017) ....................................................................39, 40

*In re Ring LLC Privacy Litigation*,
    No. 19-10899, 2021 WL 4557222 (C.D. Cal. 2021) ......................................13, 14

*In re Uber Text Messaging*,
    No. 18-CV-02931-HSG, 2019 WL 2509337 (N.D. Cal. June 18, 2019) ............10, 27

*Jack v. Ring LLC*,
    91 Cal. App. 5th 1186 (Ct. App. 2023) ........................................................... 37

*Jackson v. Amazon.com, Inc.*,
   65 F.4th 1093 (9th Cir. 2023) ...................................................................................passim

*Jeong v. Nexo Cap. Inc.*,
   No. 21-CV-02392, 2023 WL 2717255 (N.D. Cal. Mar. 29, 2023) ........................................... 37

*Juarez v. Jani-King of Cal., Inc.*,
   No. 09-3495 SC, 2010 WL 3766649 (N.D. Cal. Sept. 24, 2010) ............................................. 6

*Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004) at 43
   389 F.3d 1191 (11th Cir. 2004) .................................................................................... 43

*Lee v. Tesla, Inc.*,
   No. SACV20-00570, 2020 WL 10573281 (C.D. Cal. Oct. 1, 2020)........................................ 14

*Lee v. Ticketmaster L.L.C.*,
   No. 18-CV-05987-VC, 2019 WL 9096442 (N.D. Cal. Apr. 1, 2019)..............................22, 26

*Lim v. Tforce Logistics, LLC*,
   8 F.4th 992 (9th Cir. 2021).......................................................................................... 33

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005)...................................................................................... 43

*Loewen v. Lyft, Inc.*,
   129 F. Supp. 3d 945 (N.D. Cal. 2015).............................................................................. 15

*Long v. Fid. Water Sys., Inc.*,
   No. C-97-20118 RMW, 2000 WL 989914 (N.D. Cal. May 26, 2000)...................................... 32

*Long v. Provide Commerce, Inc.*,
   245 Cal.App.4th 855 (Ct. App. 2016) ............................................................................. 15

*Lovig v. Best Buy Stores LP*,
   No. 18-cv-02807, 2019 WL 2568851 (N.D. Cal. June 21, 2019)............................................ 13

*Maree v. Deutsche Lufthansa AG*,
   No. SACV20885, 2021 WL 267853 (C.D. Cal. Jan. 26, 2021)..............................................24, 28

*McGill v. Citibank N.A.*,
   2 Cal. 5th 945 (2017) ................................................................................................. 35

*McKee v. Audible, Inc.*,
   No. CV 17-1941-GW(EX), 2017 WL 4685039 (C.D. Cal. July 17, 2017) ............................... 39

*McLellan v. Fitbit, Inc.*,
   No. 3:16-CV-00036-JD, 2017 WL 4551484 (N.D. Cal. Oct. 11, 2017)................................... 12

*Metalclad Corp. v. Ventana Env't Organizational P'ship*,

iv

109 Cal. App. 4th 1705 (Ct. App. 2003) ........................................................................... 42

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ........................................................................................................... 11

*Murphy v. DirecTV, Inc.*,
724 F.3d 1218 (9th Cir. 2013) ............................................................................. 11, 39, 41

*Nagrampa v. MailCoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006) ......................................................................... 31, 32, 33, 34

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ................................................................................... 15, 16

*Nguyen v. Tesla, Inc.*,
No. 819CV01422JLSJDE, 2020 WL 2114937 (C.D. Cal. Apr. 6, 2020) ........................... 35, 36

*Nielsen Contracting, Inc. v. Applied Underwriters, Inc.*,
22 Cal. App. 5th 1096 (Ct. App. 2018) ............................................................................ 31

*Norcia v. Samsung Telecommunications Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ......................................................................................... 26

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ..................................................................................... 21, 25

*Ortolani v. Freedom Mortg. Corp.*,
No. EDCV171462, 2017 WL 10518040 (C.D. Cal. Nov. 16, 2017) ..................................... 32

*Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) ........................................................................ 21, 25

*Peterson v. Lyft, Inc.*,
No. 16-CV-07343-LB, 2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) .............................. 21, 26

*Rajagopalan v. NoteWorld, LLC*,
718 F.3d 844 (9th Cir. 2013) ......................................................................................... 39

*Redbox Automated Retail, LLC v. Buena Vista Home Enter., Inc.*,
399 F. Supp. 3d 1018 (C.D. Cal. 2019) ............................................................................ 22

*Sadlock v. The Walt Disney Company*,
No. 22-CV-09155-EMC, 2023 WL 4869245 (N.D. Cal. July 31, 2023) ................. 22, 24, 26, 28

*Saravia v. Dynamex, Inc.*,
310 F.R.D. 412 (N.D. Cal. 2015) .................................................................................... 33

*Savetsky v. Pre-Paid Legal Servs., Inc.*,
No. 14-03514 SC, 2015 WL 604767 (N.D. Cal. Feb. 12, 2015) ..................................... 15, 18

*Sellers v. JustAnswer LLC,*
   73 Cal. App. 5th 444, 289 Cal. Rptr. 3d 1 (2021)....................................................15, 19, 28, 29

*Setty v. Shrinivas Sugandhalaya LLP,*
   3 F.4th 1166 (9th Cir. 2021) ....................................................................................................... 39

*Shea v. Household Bank (SB), Nat'l Assn.,*
   105 Cal. App. 4th 85, 129 Cal. Rptr. 2d 387 (2003)................................................................. 33

*Sifuentes v. Dropbox, Inc.,*
   No. 20-CV-07908-HSG, 2022 WL 2673080 (N.D. Cal. June 29, 2022)............................20, 22

*Snarr v. HRB Tax Grp., Inc.,*
   839 F. App'x 53 (9th Cir. 2020)................................................................................................. 35

*Snow v. Eventbrite, Inc.,*
   No. 3:20-CV-03698-WHO, 2020 WL 6135990 (N.D. Cal. Oct. 19, 2020)............................. 15

*Sonic-Calabasas A, Inc. v. Moreno,*
   57 Cal.4th 1109 (2013)............................................................................................................... 31

*Sparling v. Hoffman Const. Co.,*
   864 F.2d 635 (9th Cir. 1988) ..................................................................................................... 15

*Stiener v. Apple Computer, Inc.,*
   No. C 07-4486 SBA, 2007 WL 4219388 (N.D. Cal. Nov. 29, 2007)........................................ 14

*Stout v. Grubhub Inc.,*
   No. 21-CV-04745-EMC, 2021 WL 5758889 (N.D. Cal. Dec. 3, 2021).................................... 36

*Stover v. Experian Holdings, Inc.,*
   978 F.3d 1082 (9th Cir. 2020)...........................................................................................19, 20, 21

*Boucher v. All. Title Co.*
   127 Cal. App. 4th 262 (Ct. App. 2005) ...................................................................................... 41

*Swift v. Zynga Game Network, Inc.*
   805 F. Supp. 2d 904 (N.D. Cal. 2011)........................................................................................ 21

*Szetela v. Discover Bank,*
   97 Cal.App.4th 1094 (Ct. App. 2002) ...................................................................................32, 33

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,*
   925 F.2d 1136 (9th Cir. 1991)..................................................................................................... 10

*Tompkins v. 23andMe, Inc.,*
   No. 5:13-cv-05682, 2014 WL 2903752 (N.D. Cal. June 25, 2014)......................................21, 25

*U.S. for Use and Benefit of Newton v. Neumann Caribbean Int'l, Ltd.*,
   750 F.2d 1422 (9th Cir. 1985) ............................................................................... 14

*United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*,
   46 Fed. Appx. 412 (9th Cir. 2002) ........................................................................ 11

*United Educ. Inst.*,
   No. SACV1500810, 2015 WL 12743599 (C.D. Cal. Dec. 15, 2015) ....................... 30

*Wiedenbeck v. United Educ. Inst.*,
   No. SACV1500810, 2015 WL 12743599 (C.D. Cal. Dec. 15, 2015) ....................... 40

**Other Authorities**

17A AM. JUR. 2D CONTRACTS § 30 (August 2020 Update) ........................................ 14

RESTATEMENT OF THE LAW CONSUMER CONTRACTS § 3 (L. Inst., Tentative Draft No. 2, June 2022)
   ...................................................................................................................... 14

## I.     INTRODUCTION

This case concerns one of the most egregious privacy violations in the last few years. Unknown to consumers, Defendant GoodRx Holdings, Inc. ("GoodRx") disclosed and allowed the Advertising and Analytics Defendants[1] to intercept highly sensitive medical information about consumers prescription drugs for years. GoodRx paid a monetary penalty to settle claims arising out of this conduct with Federal Trade Commission in February of 2023. It now seeks to avoid answering to consumers for their claims by moving to compel four of the six Plaintiffs in this action to arbitration and staying or dismissing the entire proceeding pending the outcome of those presumptive arbitrations. There are multiple reasons to deny these motions.

As to GoodRx's motion to stay or dismiss the case, GoodRx glosses over the fact that two Plaintiffs—E.C. and Wilson—never agreed to arbitrate any of their claims and it was unable to locate any evidence that they did. While GoodRx relegates this concession to a footnote (*see* Motion at 1, n.1) that fact is fatal to its argument that these proceedings should be stopped. There is simply no basis—contractual or otherwise—to delay Plaintiffs E.C. or Wilson from pursuing their claims, which they correctly filed in this Court. *See* Section IV.A, below.

Regarding the four Plaintiffs GoodRx contends agreed to arbitration, there are numerous legal and evidentiary deficiencies in its motion.

One of the most glaring deficiencies pertains to *when* and *how* its arbitration agreement went into effect. Despite trying to present itself as a consumer-friendly company, GoodRx unilaterally modified its Terms of Use ("TOU") for most services in January 2020 to add an arbitration provision and class action wavier for the first time. This new term was grossly one-sided, not only prohibiting users from seeking public injunctive relief in violation of California law, but retroactively stripped users of the right to pursue existing claims in court. GoodRx never notified its users of this highly material change to the TOU. Indeed, its General Counsel, Gracye Cheng testified that the company never even tried to notify Plaintiffs or other users of TOU changes. Ex. E[2] at 41:3-46:4.

---

[1] "Advertising and Analytics Defendants" refers to Google LLC ("Google"), Criteo Corp. ("Criteo"), and Meta Platforms, Inc. ("Meta").]

[2] All references to "Ex." are Exhibits annexed to the Declaration of Christian Levis.

1    Under Ninth Circuit law, GoodRx's intentional failure to notify individuals, like Plaintiffs

2    Jane Doe II and John Doe, who began using its platform prior to January 2020 that it had materially

3    changed the terms of their agreement to add an arbitration provision defeats any claim of contract

4    formation or asset. *See* Section IV.B, below. GoodRx ignores this entirely, relying on cases dealing

5    with new users, agreeing to new terms, in new transactions. But that analysis is irrelevant here, at

6    least as to long-term users of its services like Plaintiffs Jane Doe II and John Doe, because users

7    simply cannot agree to terms they do not know of, and have no duty to check for secretly added new

8    terms to address GoodRx's attempt to hide them.

9    The evidence GoodRx relies on to support its claim that each of the four Plaintiffs subject to

10   its motion affirmatively agreed to arbitration is also woefully deficient and cannot carry its burden

11   here. GoodRx relies on a single source of evidence to support its motion: the Declarations of Gracye

12   Cheng. ECF Nos. 107-002; 125. While these declarations purport to provide documents and

13   information confirming that certain Plaintiffs affirmatively assented to GoodRx's arbitration

14   provision, in reality it is nothing more than a series of untested, unverified assumptions. For instance,

15   while GoodRx offers screenshots to prove Plaintiffs would have been on notice of its terms, Ms.

16   Cheng confirmed at her deposition that GoodRx does not have any records indicating what screen a

17   Plaintiff or any other user saw at a given time. Ex. E at 71:3-6; 110:12-20. The examples in the

18   declaration are purely hypothetical. As are GoodRx's assertions about what its platform looked like,

19   how its terms were displayed, where links appear, or other critical features at the time Plaintiffs

20   signed up or created accounts. Ms. Cheng admitted that GoodRx conduced *no testing* to validate that

21   its app or website worked as described in her declaration on Plaintiffs' devices. Ex. E at 110:12-20

22   ("Q: How was this screen created? . . . A: This is from, this is a record from a team member, so, you

23   know, we believe this is accurate, and I'm not, I'm not even sure this is just what our team

24   provided."). These generalized assumptions are not just misleading they are not "evidence." Having

25   failed to present any actual proof of their contentions relating to arbitration, GoodRx's motion must

26   be denied.

In addition to these evidentiary flaws, the arbitration provision itself and accompanying delegation clause are unconscionable. As one court in this District recently recognized, the procedural issues with foisting new terms on users without any notice is so egregious that little more is required to invalidate GoodRx's terms.[3] The substantive flaws with the terms—including the imposition of an illegal waiver of public injunctive relief and delegation clause that sends to arbitration issues barred by California law—easily carries the day for all four Plaintiffs.

The Advertising and Analytics Defendants, for their part, piggyback on GoodRx's arguments. However, as no Plaintiff agreed to arbitrate any claims with them, there is no reason why claims against these Defendants should be compelled to arbitration here. Their desperate bid to avoid litigation by relying on the doctrine of equitable estoppel must be rejected. This remedy only applies in limited circumstances when the claims asserted against a non-signatory to a contract rely on or are inextricably intertwined with the obligations in that agreement. None of Plaintiffs' claims against the Advertising and Analytics Defendants meet these criteria and as a result, their motion must be denied.

## II.     STATEMENT OF THE ISSUES

The issues before the Court are: (1) whether GoodRx has a valid, enforceable contract that includes an agreement to arbitrate with any Plaintiffs; (2) whether the issue of contract formation is properly an issue for the court; (3) whether GoodRx's purported arbitration agreement covers each of the claims at issue; (4) whether these proceedings should continue in court.

## III.    BACKGROUND

Plaintiff Jane Doe filed this action on February 2, 2023, against Defendants GoodRx, Criteo, Meta, and Google for their unlawful disclosure and interception of users' personal information and sensitive health information. After consolidation of related cases (ECF No. 85), GoodRx moved to compel four of the six Plaintiffs to arbitration on June 9, 2023 ("Motion"). ECF No. 107. Those Plaintiffs

---

[3] Gina Kim, *Live Nation Fights Uphill to Arbitrate Antitrust Suit*, Law360 (July 13, 2023 at 10:08 PM), https://www.law360.com/articles/1699585 (quoting Judge Wu at July 13, 2023 hearing in *Heckman v. Live Nation Ent., Inc. et al*, No. 2:22-CV-00047-GW-GJSX (C.D. Cal. 2023) (explaining even changing arbitration providers is a "dramatic shift" in terms raising questions "as to why there wasn't any notice of this provided . . . just to give some sort of notice for people potentially going onto the site.").

are:

- Plaintiff **Jane Doe II**, who used the GoodRx mobile application starting in approximately 2016 and signed up for GoodRx Gold in 2018 (¶¶ 29-30). [4]

- Plaintiff **John Doe**, who used GoodRx's website and mobile application starting in 2016. ¶ 36.

- Plaintiff **Jane Doe**, who used GoodRx's website in August 2022 to obtain medical treatment and a prescription medication. ¶ 23.

- Plaintiff **Jose Marquez**, who used the GoodRx mobile application between approximately June 2021 and August 2021 to obtain discounts and prescription coupons and had subscribed to GoodRx Gold. ¶¶ 47-49.

GoodRx argues that these four Plaintiffs agreed to arbitrate all of their claims based on an arbitration provision that first appeared in the January 2020 version of its Terms of Use ("TOU"). Declaration of Gracye Cheng ("Cheng Decl."), ECF No. 107-2 ¶ 39. However, GoodRx concedes that as to Plaintiffs E.C. and Wilson, who allege to have only used GoodRx's platform before it added an arbitration provision to its TOU, that it has no evidence and "has been unable to confirm" they agreed to arbitration. Motion at 1 n.1.

On June 16, 2023, Plaintiffs served arbitration-related discovery requests on GoodRx, seeking all documents pertaining to the terms of use and sign-up/log-in process screenshots that Plaintiffs would have seen during their respective use of GoodRx's services. *See* Ex. A. The requests also sought all data reflecting Plaintiffs' use of GoodRx's services. *Id*. GoodRx produced a paltry total of 27 documents in response to these requests on July 17, 2023. This limited production only included select versions of GoodRx's TOU and what GoodRx claims are partial mockups or screenshots of the sign-up/log-in process for certain GoodRx properties after January 2, 2020, when GoodRx purportedly added the arbitration agreement to its TOU. Similarly, the data produced only reflected Plaintiffs' use of GoodRx's products after January 2020. GoodRx contended, without any basis, that any documents or data prior to this date would be "irrelevant" to the present motion. *See* Ex. B at 5, 7, 9.

---

[4] Paragraphs in Consolidated Class Action Complaint (ECF No. 102) are referred to as "¶" throughout.

Plaintiffs sent a letter to GoodRx on July 24, 2023, explaining this production was deficient because it was improperly limited to documents that GoodRx believes supports its position. GoodRx withheld or refused to search for documents and data, including TOUs, screenshots, or information about Plaintiffs' usage of its platform prior to January 2020. GoodRx also impermissibly withheld documents reviewed or relied on by Gracye Chang, an employee who submitted a declaration in support of its motion and refused to search for relevant communications to Plaintiffs and other class members. GoodRx responded to Plaintiffs on July 27, 2023 offering to supplement its production with "materially unique" versions of its TOUs between 2016 and 2023. However, it refused to produce other highly relevant documents and information, including (among other things) depictions of the screens Plaintiff Jane Doe II would have encountered (1) when she signed up for GoodRx; and (2) when she signed up for GoodRx Gold. Just two days before this opposition was due, GoodRx then produced 60 additional documents consisting almost entirely of Terms of Use, with only two documents reflecting what it calls "depictions" of certain screens it self-selected and one containing data they claim relates to Plaintiff Marquez.

Plaintiffs then deposed two GoodRx witnesses on August 3, 2023: Gracye Cheng, the employee who signed the two declarations in support of GoodRx's motion, and Alden Gordon a Senior Vice President of Business Intelligence and Analytics. The deposition testimony of these witnesses confirms considerable gaps in the evidentiary record GoodRx claims establishes consent to arbitration. Perhaps most shocking, GoodRx's declarant Gracye Cheng admits she did essentially nothing to verify the accuracy of the representations made in her declaration in support of GoodRx's Motion, including her assertion that Plaintiffs "saw" certain screens while signing up or otherwise using the GoodRx Platform. Ex. E, 67:23-68:18, Aug. 3, 2023 ("Q: Did you ask an engineer to confirm [that the check box would have been required to register] for you for any version of the website?" . . . "A: I don't hold that - - I don't know if that would have been, they would have implemented the logic that required it. I don't think I, it would have been something I would have specifically confirmed as part of any regular process."); *id.* 71:3-71:5 ("Q: Does GoodRx have a record of the specific screen each user saw at sign-up?" "A: I don't believe so, no."); *id.* 74:4-75:18

("Q: What testing did you perform to confirm that the blue text in this screen was a valid hyperlink at the time that Jane Doe signed up for GoodRx?" "A: We, we did not do testing specific to mobile browser or device."); *id.* 75:19-76:23 ("Q: . . . What did you do to confirm that on the specific screen that Jane Doe saw, using the device that she had and the browser at the time, that she was required to click I agree in order to create a GoodRx Care account?" "A: We did not do device specific testing."); *id.* 97:9-23 ("Q: What tests did you do to confirm that the blue text in the screen would have appeared in blue and as a hyperlink on the specific screen that was presented to Jane Doe II?" "A: We did not do device-specific testing."); *id.* 103:24-104:6 ("Q: You said it should have, but did you do any testing to confirm specifically that it would have displayed that way to Jane Doe II?" "A: No."); *id.* 109:24-110:20 ("Q: Okay. What did you do to confirm this was the exact screen John Doe would have seen?" "A: This is based on what, the send coupon experience, which based on, like via email, which, based on our records, and John Doe used, would have looked like on mobile web, we, I believe yesterday we also provided a desktop version that is very similar as well, so that's what we believe he would have seen, or, you know, when he used the site." "Q: How was this screen created?" "A: This is from, this is a record from a team member, so you know, we believe this is accurate, and I'm not, I'm not even sure this is just what our team provided."). Given that Ms. Cheng's representations lack any factual or evidentiary support, the Court should not consider them as "facts" for purposes of GoodRx's motion. *Juarez v. Jani-King of Cal., Inc.*, No. 09-3495 SC, 2010 WL 3766649, at *2 (N.D. Cal. Sept. 24, 2010) (striking a declaration because it contained "argumentative and conclusory" statements and the declarant "lack[ed] personal knowledge of the statements" therein).

This is especially true as Ms. Cheng has ***already admitted*** some of the representations she made in her initial declaration "may" be incorrect. *See* ECF No. 125. Specifically, Ms. Cheng originally represented that Plaintiff Marquez would have encountered a certain screen "presented to [him] during the creation of his GoodRx Gold account in June 2021." ECF No. 107-2 at 13. But Ms. Cheng subsequently submitted what she calls a "supplemental" (rather than corrected) declaration just two days before this opposition was due admitting this statement was likely false. She now

claims that prior screen "may have gone into effect" *after* Plaintiff Marquez used GoodRx Gold and now claims there are *different* screens Mr. Marquez would have seen "in or around June 2021." Thus, it is clear Ms. Cheng's statements—which she herself admits may ultimately be wrong— cannot be considered evidence for purposes of GoodRx's Motion.

Regarding Alden Gordon, he testified he was only asked to search for records relating to Plaintiffs who used GoodRx Care. And while he claims that these GoodRx Care Plaintiffs agreed to what he calls "legal documents" because there is a "time stamp" record reflecting some action taken during the sign-up process, he *cannot confirm* what action the time stamp actually reflects. Ex. F 48:6-49:3 ("Q: Do you know what's next to the check boxes that users are selecting?" "A: I believe text related to the legal documents. I'm not intimately acquainted with that content, though." "Q: So there's text next to a check box for GoodRx Care, and that's what this time stamp would be indicated, when that check box was selected?" "A: I'm not 100 percent, again, the exact timing of the time stamp is a question of when the front end sends the request to the back end. And I don't know if that request goes at the time of the check box click, or at the time of creating, or hitting the create account button, or some other step in the account creation process. But yeah."). Stated differently, Mr. Gordon is unaware if the time stamp reflects the time a user checked a box (or what box), selected a button, or took some other action on the "screens" GoodRx claims (without support) Plaintiffs saw. *Id*. Nor can he confirm what actual "legal document[]" these Plaintiffs purportedly agreed to because GoodRx does not perform version control, i.e., while it may purport to indicate a Plaintiff has "agreed" to some unspecified TOU, it does not state which version of the TOU (i.e., whether it was one containing an arbitration provision buried inside the policy or one that did not contain an arbitration provision at all). *Id*. 91:19-92:15 ("Q: So when you searched for these specific plaintiffs, could you tell which version of the agreement it was?" "A: I was not looking, I was mostly looking at the name. I just don't know if there are time stamps on the legal documents table itself. I joined from the legal document signatures table to the legal documents table just to get the name of the legal document."); *see* Ex. G(Plaintiff Jane Doe's data containing no indication of what version of the terms she purportedly agreed to). Thus, these purported "records" do not establish consent because

it's not clear what these records are even tracking in the first instance. And even more alarming, Mr. Gordon testified he is unaware if GoodRx keeps similar (albeit deficient) records about what other GoodRx users supposedly "agree" to, be it a TOU, HIPAA policy, privacy policy, or some other document. Ex. F 116:17-117:2 ("Q: Do you know if records like this exist for other types of GoodRx users? I know you said this was for GoodRx Care, so do you know if this type of record exists for GoodRx main users?" "A: I don't know. I've only used this information for GoodRx Care users." "Q: What about GoodRx Gold? Do you know if records like this exist for GoodRx Gold users, for plaintiffs who are GoodRx Gold users?" "A: I do not know if - - obviously, if people also, someone can be a GoodRx Gold user and a Care user, in which case their Care account would have this information. I don't know if this exists for all GoodRx Gold accounts."). Plaintiffs requested records similar to those Mr. Gordon searched for GoodRx Care Plaintiffs, and GoodRx's counsel has confirmed they do not exist, i.e., GoodRx admits it has no records for these Plaintiffs tracking their purported "consent" to any terms, let alone ones containing an arbitration provision. *See* Ex. D ("Data reflected in GDRX-00000141 produced for Jane Doe is unique to GoodRx Care . . . the same data is not available for any other the other Arbitration Plaintiffs."). Other gaps in the evidentiary record remain as well:

**Plaintiff Jane Doe II's Regular GoodRx Account.** Plaintiff Jane Doe II alleges she used the GoodRx mobile application since 2016. ¶ 29. GoodRx has failed to produce any information regarding Plaintiff Jane Doe II's use of GoodRx between 2016 and 2019, unilaterally choosing to only produce documents and data relating to one date she used her GoodRx Gold account.

**Plaintiff Jane Doe II's GoodRx Gold Account.** Ms. Cheng's declaration states that Jane Doe II would have encountered a screen in March 2020 when she signed up for GoodRx Gold that "would have . . . required [her] to click a button in order to continue near the phrase 'By continuing, you agree to GoodRx's Terms of Service and Privacy Policy.' The words 'Terms of Service' and 'Privacy Policy' were written in blue font, alerting Jane Doe II that the terms themselves were hyperlinked.'" Cheng Decl. ¶ 32. But Ms. Cheng does not provide a "depiction" of what this screen looked like (*see id.*), nor does she provide any support for her statement that the screen: (1) would

have presented a "button"; (2) that the button would have been near the phrase quoted above; (3) that the quoted language would have been presented on the screen at all; (4) that "Terms of Service" and "Privacy Policy" would have been in blue font; or (5) that those terms would have been hyperlinked. Ex. E 90:23-93:16 (referring to Cheng Decl. ¶ 32, "Q: Okay. What records are you referring to in this statement?" "A: I'm referring to the fact that the product experience was such that you needed to, you know, in order to continue, you would have been presented with the terms, which contained an arbitration provision and privacy policy. And that in order to register, which we see that the person did, they would have continued in this form." "Q: You didn't do any device testing to confirm that that's how it worked?" "A: Right.").

Plaintiffs requested screenshots that support these assertions, but GoodRx refused to produce them, conveniently claiming on July 27, 2023 it is "unable to recreate a visual depiction of the consent screen Jane Doe II would have seen" at the time she used the GoodRx mobile application in March 2020. *See* Ex. D. This is unlikely, given that Mr. Gordon testified GoodRx keeps versions of its historical mobile applications (Ex. F 60:15-20 ("All GoodRx code lives in a version control tool called GitHub it's a, it's a service used to store that code. And that should store all previous versions of the code since we started using that service.")), which it could easily run and examine to replicate the screens that would have been available on that date.

**Plaintiff John Doe's GoodRx Account.** Plaintiff John Doe alleges he used GoodRx since 2016. ¶ 36. However, GoodRx has only produced data reflecting Plaintiff John Doe emailing himself a coupon on August 2, 2020. GoodRx conveniently claims it cannot identify other data relating to Plaintiff John Doe before this date, despite that Mr. Gordon testified GoodRx employees can search its "data store" for user information by (1) name; (2) email; (3) the unique identifier for GoodRx users (which GoodRx has produced for Plaintiff John Doe); as well as (4) other information, such as the user's medication and the date they searched for it. Ex. F 33:13-38:7 (explaining a user's "drug searches" could be tied to their account if they recently logged in on that browser through "a cookie" even if the user was "not logged in" at the time of the search.).

**Jose Marquez**. As described above, Ms. Cheng has given inconsistent information about what she claims would have been the "screens" Jose Marquez would have encountered when signing up for GoodRx Gold in June 2021. It is clear her assertions lack factual support and cannot be treated as evidence.

## IV.    LEGAL STANDARD

**Contract Formation.** The Federal Arbitration Act ("FAA") "does not govern [the] question of contract formation." *Burzdak v. Universal Screen Arts, Inc.*, No. 21-CV-02148-EMC, 2021 WL 3621830, at *3 (N.D. Cal. Aug. 16, 2021); *see also Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (explaining courts determine (1) "whether a valid agreement to arbitrate exists" (2) "whether the agreement encompasses the dispute at issue" including related such as "the particular contractual defenses to enforcement of the arbitration clause at issue" such as "breach and waiver"). These issues are "not [] delegable" to an arbitrator. *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1248 (N.D. Cal. 2019); *In re Uber Text Messaging*, No. 18-CV-02931-HSG, 2019 WL 2509337, at *5 (N.D. Cal. June 18, 2019) (explaining courts evaluate the formation of an arbitration agreement under "'general state-law principles of contract interpretation,' without a presumption in favor of arbitrability.").

The party seeking to compel arbitration bears the burden of proving "by a preponderance of the evidence" that there was an agreement to arbitration, and a court may grant such motion "[o]nly when there is no genuine issue of fact concerning the formation of the agreement." *Id*. (citing *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991); *see also Berman v. Freedom Fin. Network, LLC*, 2018 WL 2865561, at *4 (N.D. Cal. June 11, 2018) (denying motion to compel arbitration where movant "failed to show the absence of a genuine issue of fact"); *In re Uber Text Messaging*, 2019 WL 2509337, at *5 (explaining "the party opposing arbitration is entitled to the benefit of all reasonable doubts and inferences" and "a court may find that an agreement to arbitrate exists as a matter of law '[o]nly when there is no genuine issue of fact concerning the formation of the agreement.'").

**Equitable Estoppel.** A third party seeking to enforce an arbitration agreement to which it is not

1  a party may do so only if (1) the "signatory must rely on the terms of the written agreement in asserting

2  its claims against the nonsignatory or the claims are intimately founded in and intertwined with the

3  underlying contract" or (2) "when the signatory alleges substantially interdependent and concerted

4  misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct

5  are founded in or intimately connected with the obligations of the underlying agreement." *Murphy v.*

6  *DirecTV, Inc.,* 724 F.3d 1218, 1229 (9th Cir. 2013). This exception to the general rule that "only

7  signatories to an arbitration agreement are obligated to submit to binding arbitration" is "narrowly

8  confined." *Id.*

9      **Motion to Stay.** While the Court has discretion in denying or granting a stay, "the Ninth Circuit

10  has noted 'a preference for proceeding with the non-arbitrable claims when feasible'" and that "a court

11  should stay 'only when doing so would serve some legitimate interest of the parties or the court.'" *Gray*

12  *v. Seui,* No. 20-CV-0198, 2020 WL 12228937, at *5 (N.D. Cal. Aug. 5, 2020) (internal citations

13  omitted).

14  **V.    ARGUMENT**

15      **A.    Plaintiffs E.C.'s and Wilson's Claims Should Proceed at a Minimum.**

16      Before turning to GoodRx's motion to compel arbitration, its motion to dismiss or otherwise stay

17  the case in its entry should be denied because—as GoodRx concedes—there is no evidence Plaintiffs

18  E.C. and Wilson agreed to arbitrate any claims. *See* Motion at 1 n.1. It is within the court's discretion to

19  refuse to stay litigation among non-arbitrating parties pending the outcome of a potential arbitration.

20  *Bold Ltd. v. Rocket Resume, Inc.,* No. 22-CV-01045-BLF, 2023 WL 4157626, at *8 (N.D. Cal. June 22,

21  2023) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 20 n.23 (1983)).

22  Notably, the Ninth Circuit has stated a preference for proceeding with non-arbitrable claims where

23  feasible, (*see Gray,* 2020 WL 12228937, at *5 (citing *United Commc'ns Hub, Inc. v. Qwest Commc'ns,*

24  *Inc.,* 46 Fed. Appx. 412, 415 (9th Cir. 2002)), and it has acknowledged there is a "heavy presumption

25  [that] the arbitration and the lawsuit will each proceed in its normal course." *United Commc'ns Hub,*

26  *Inc.,* 46 Fed. Appx. at 415 n.10.

27      Where an arbitration agreement potentially impacts only certain plaintiffs in an action, the claims

28

of those plaintiffs who did not agree to arbitration proceed as they would in any other litigation. *Ferrari v. Mercedes Benz USA, LLC*, 2018 WL 3399320, at *2 (N.D. Cal. Jan. 18, 2018) (declining to stay claims brought by plaintiffs who did not agree to arbitrate their claims pending "resolution of the [arbitration plaintiffs'] claims in arbitration"); *Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 991 (same); *Bold Ltd. v. Rocket Resume, Inc.*, No. 22-CV-01045-BLF, 2023 WL 4157626, at *8 (N.D. Cal. June 22, 2023) (same).

A stay of the entire litigation is only "appropriate where the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *California Crane Sch., Inc. v. Google LLC*, 621 F. Supp. 3d 1024, 1033 (N.D. Cal. 2022). Neither of these factors apply here. Having never agreed to arbitration, Plaintiffs E.C. and Wilson do not have any arbitrable claims, so there are none that predominate. *See Congdon v. Uber Technologies, Inc.*, 226 F.Supp.3d 983, 991 (N.D. Cal. 2016) (declining to stay claims of plaintiffs who did not agree to arbitrate claims, which would "frustrate the intent of the [non-arbitration plaintiffs]" who did not agree "to arbitrate their claims in the first place."); *California Crane Sch.*, 621 F. Supp 3d at 1033 (finding "arbitrable claims" do not predominate where litigants "will presumably need to eventually litigate the remaining non-arbitrable claims irrespective of whatever happens in the arbitration."). For the same reason, none of Plaintiffs E.C.'s and Wilson's claims depend on (or could even be impacted by) the outcome of any arbitration. *See Congdon*, 226 F.Supp.3d at 991(explaining "decision of the arbitrators with respect to the [arbitration plaintiffs]" would not "in some way bind the Court with respect to the [non-arbitration plaintiffs]"); *Chen v. Bank of Am., N.A.*, No. CV 19-6941-MWF (SK), 2020 WL 4561658, at *3 (C.D. Cal. Mar. 31, 2020) (explaining "arbitration is not binding on the Court" such that "the arbitrator's decision will not necessarily impact the outcome of the non-arbitrable claims."); *McLellan v. Fitbit, Inc.*, No. 3:16-CV-00036-JD, 2017 WL 4551484, at *5 (N.D. Cal. Oct. 11, 2017) (declining stay where defendant "has not shown that the outcome of the arbitration proceedings will have any effect on this Court's consideration of [the non-arbitration plaintiff's] claims.").

This process should begin now. There is no reason Plaintiffs E.C. and Wilson should wait until after *other* persons who may have agreed to arbitration obtain relief and unduly delay the resolution of

their claims. *See Ferrari v. Mercedes Benz USA, LLC,* No. 17-cv-00018-YGR, 2018 WL 3399320, at *2 (N.D. Cal. Jan. 18, 2018) (denying motion to stay litigation because "[d]elaying resolution of the individual claims has the potential to prejudice the remaining plaintiffs and putative class members."); *Congdon,* 226 F.Supp.3d 983 (explaining defendant "cannot have its cake and eat it, too" and must litigate claims of non-arbitration plaintiffs because it would not "negatively impact or undermine the parallel arbitration proceedings, or [] in some way prejudice [defendant]"). Holding otherwise would impose the contractual choices of other individuals on them in violation of the most basic tenants of contract law. *See In re Ring LLC Privacy Litigation,* 2021 WL 4557222 (C.D. Cal. 2021) ("'[e]ven the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement.'") (internal citations omitted).

GoodRx does not identify a single case supporting its position that FAA "require[s]" the Court to stay the entire action if "any issue" is referred to arbitration. Motion at 22. *Lovig v. Best Buy Stores LP,* 2019 WL 2568851, at *3 (N.D. Cal. June 21, 2019)—the sole authority cited for this proposition— involved a single plaintiff who agreed to arbitrate ***some*** but not ***all*** of his claims. The *Lovig* court found that because at least some of this plaintiff's claims would be compelled to arbitration, it made little sense to engage in parallel litigation over claims that turned on the same facts when they could be addressed at the same time in the same arbitration. Here, unlike *Lovig*, Plaintiffs E.C. and Wilson never agreed to arbitrate any of their claims and should be allowed to proceed with the action regardless of what happens to the other Plaintiffs.

*Congdon v. Uber Techs., Inc.*, which GoodRx also relies on, actually supports rejecting a stay. *See* Motion at 22 (citing 226 F. Supp. 3d 983). In *Congdon,* the court denied the defendant's motion to stay the claims of plaintiffs who had opted out of arbitration, even though others had not, finding "there is no justification for delaying judicial resolution of the action with regards to the plaintiffs who opted out of the arbitration provision . . . [Even though] the claims of [all plaintiffs] involve the same operative facts—*i.e.* the interpretation of the agreements and whether [defendant] breached such agreements—the resolution of such claims in the arbitral proceedings have no bearing on the resolution of such claims in

court." *Id.* at 990. As the *Congdon* court explained this "would not result in a waste of judicial resources," as the claims of plaintiffs who opted out of arbitration would need to be litigated regardless. *Id.* at 991. That both the arbitration and federal court action might address similar issues and potentially reach different results was "insufficient" to overcome the plaintiffs' interests in pursuing their claims in court. *Id.* Several courts have reached a similar conclusion. *See Chen v. Bank of Am., N.A.*, 2020 WL 4561658, at *3 (C.D. Cal. Mar. 31, 2020) (explaining "some overlap" between arbitrable and non-arbitrable claims is insufficient to "stay the case" where "the litigation will have to go forward regardless of the outcome in arbitration."); *In re Ring LLC Privacy Litigation,* 2021 WL 4557222 (explaining the risk of "[a]ny potentially 'inconsistent' rulings complained of by [defendant] are the inevitable result of [their] opting to include an arbitration agreement in its Terms of Use."); *Portland Gen. Elec. Co. v. Liberty Mutual Ins. Co.*, at *7 (D. Or. July 27, 2016) (explaining that inconsistent results are permissible in such circumstances "because the relevant federal law requires piecemeal resolution when necessary to give effect to an arbitration agreement") (other internal citations omitted)); *Bold Ltd. v. Rocket Resume, Inc.*, at *9 (N.D. Cal. June 22, 2023) (explaining having to "defend a suit, without more, does not constitute a 'clear case of hardship or inequity'").

Defendant's reliance on *Forsyth*, *Neumann Caribbean Int'l*, and *Lee* for the proposition that staying the entire action makes good sense," even where some plaintiffs are not subject to arbitration," is misplaced. Motion at 22. Each of these cases is distinguishable. GoodRx relies on both *Forsyth v. HP Inc.*, 2018 WL 732722 (N.D. Cal. Feb. 6, 2018) and *U.S. for Use and Benefit of Newton v. Neumann Caribbean Int'l, Ltd.*, 750 F.2d 1422 (9th Cir. 1985), only for the proposition that judicial economy and risk of uncertainty ***might*** warrant a stay, which, as demonstrated above, is insufficient by itself. GoodRx's reliance on *Lee v. Tesla, Inc.*, 2020 WL 10573281 (C.D. Cal. Oct. 1, 2020) is also inapposite. There, all claims were compelled to arbitration aside from California plaintiffs' claims for public injunctive relief. This is not a situation where some of Plaintiffs claims are subject to arbitration, and some are not—Plaintiffs E.C. and Wilson never agreed to arbitrate any of their claims such that they are entitled to have their claims promptly heard in federal court. *See Congdon,* 226 F.Supp.3d 983; *In re Ring LLC Privacy Litigation,* 2021 WL 4557222.

At bottom, the Court should not deprive Plaintiffs E.C. and Wilson, who did not agree to arbitration, of their right pursue their claims in federal court.[5] In the event arbitration is compelled as to any Plaintiff, GoodRx's motion to stay or dismiss the action in its entirety should be denied.

## B.    GoodRx Cannot Show Mutual Manifestation of Assent to Arbitrate

"[M]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). California law "is clear" that a person "is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 864 (9th Cir. 2022) (quoting *Long v. Provide Commerce, Inc.*, 245 Cal.App.4th 855, 200 Cal. Rptr. 3d 117 at 122 (2016)). The burden is on the party seeking arbitration to show mutual manifestation of assent. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023). To establish notice sufficient to give rise to mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a way that made it clear "the consumer was assenting to those very terms when checking a box or clicking on a button." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 461, 289 Cal. Rptr. 3d 1, 13 (2021), reh'g denied (Jan. 18, 2022), review denied (Apr. 13, 2022) (citing *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1177 (validity of an internet agreement "turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract").

Two general paradigms of assent arise in modern-day internet transactions: "clickwrap" and "browsewrap." A clickwrap agreement "requires a user . . . to check a box or click an 'I agree' button after being presented with terms and conditions." *Savetsky v. Pre-Paid Legal Servs., Inc.*, No. 14-03514

---

[5] The cases GoodRx cites do not support its position because none of them involves a stay of non-arbitration plaintiffs' claims pending other plaintiffs' arbitration. Motion at 21; *Stiener v. Apple Computer, Inc.*, No. C 07-4486 SBA, 2007 WL 4219388, at *1 (N.D. Cal. Nov. 29, 2007) (granting a very limited stay for the defendant as to "case management conference and ADR deadlines" where the *resolution* of that defendant's own motion to compel arbitration was pending); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 966 (N.D. Cal. 2015) (dismissing the entire litigation because the only two plaintiffs were compelled to arbitrate their claims with the only one defendant); *Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 638 (9th Cir. 1988) (dismissing one plaintiff's claims only because "the arbitration clause was broad enough to bar all of the plaintiff's claims," and not addressing whether non-arbitrable claims by other plaintiffs should be dismissed due to arbitration).

SC, 2015 WL 604767, at *3 (N.D. Cal. Feb. 12, 2015). A browsewrap agreement contains "a notice that–by using the services of . . . the website–the user is agreeing to . . . the site's terms of service." *Id.* Unlike with a clickwrap agreement where users have to check a box to proceed, with a browsewrap agreement users can "continue to use the website . . . without . . . even knowing that such [an agreement] exists." *Nguyen*, 763 F.3d at 1176. For this reason, "[c]ourts are more reluctant to enforce browsewrap agreements." *Berman*, 30 F.4th at 856.

Recently, courts have identified a third type of agreement referred to as "sign-in wrap" that is a "hybrid" of clickwrap and browsewrap features. *Snow v. Eventbrite, Inc.*, No. 3:20-CV-03698-WHO, 2020 WL 6135990, at *4 (N.D. Cal. Oct. 19, 2020). Instead of requiring users to check a box or click "I agree" to the terms before using the service—like a clickwrap agreement—sign-in wrap agreements function more like browsewrap in providing that users automatically agree to the terms by registering or signing up for an account with the website. *Id.* Sign-in wrap agreements are evaluated using the same standard applied to browsewrap. *Id.* (sign-in wrap agreement must "either place the user on actual notice of the agreement or 'put[ ] a reasonably prudent user on inquiry notice of the terms of the contract.'").

Importantly, the Ninth Circuit has confirmed that when an entity unilaterally modifies[6] a Terms of Use or Terms of Service to include an arbitration provision, the defendant must clearly establish they provided "notice of the new terms because without notice, the [individuals] could not assent to new contractual terms." *Jackson*, 65 F.4th at 1098 (explaining "the burden is on [defendant] as the party seeking arbitration to show that it provided notice of a new TOS and that there was mutual assent to the contractual agreement to arbitrate. . . . Although we have experienced a technological revolution in the way parties communicate, technological innovation has not altered these fundamental principles of contract formation."). Typically, an entity can establish notice and assent to new or modified terms by demonstrating they sent out an email or other communication clearly indicating these terms have changed and by stating in the same correspondence that continuing to use the service will be asset to

---

[6] GoodRx asserts only two Plaintiffs—Plaintiff Jane Doe and Jose Marquez—purportedly accepted Terms of Use containing an arbitration provision at the time they signed up for GoodRx. For remaining Plaintiffs GoodRx seeks to compel to arbitration, GoodRx claims they somehow agreed to new Terms of Use GoodRx unilaterally modified simply by continuing to use GoodRx's service.

these "updated terms." *Id.* (citing cases). It is not enough to claim that these unilaterally modified terms were merely "accessible" on a mobile app or website or that a party agrees to them simply by continuing the relationship. *Id.* (rejecting claim that because terms were "accessibly on the Amazon Flex app" individuals had notice and assent); *id.* at 1101 (explaining "continued performance" only establishes assent when there is "notice" the terms have been revised). A party equally cannot contract around these requirements through other contractual provisions stating the individual is "responsible for reviewing this Agreement regularly to stay information of any modification." *Id.* (explaining to place the "burden . . . on the [plaintiff] to monitor the agreement for changes" would turn the "law's notice requirement on its head."). Because the law requires that a "consumer must receive a 'reasonable notice of the proposed modified term'" and a "reasonable opportunity to reject the proposed modified term" the defendant must show it "actually provided notice of those [new] terms." *Id.* (citing Restatement of the Law Consumers Contracts § 3).[7] When an entity seeking to compel arbitration fails to do so, the prior Terms of Use or Terms of Service that were actually agreed to "still govern[] the parties' relationship."

Here, GoodRx has not produced any screens depicting what Plaintiff Jane Doe II or John Doe would have seen when they first signed up for or used GoodRx. Regardless, at the time they did so in 2016, the applicable TOU did not include arbitration provisions. As described below, GoodRx never provided Plaintiff Jane Doe II or John Doe with notice these terms have changed—let alone that they included an arbitration provision that would substantively impact their relationship obviating their right to seek relief in a judicial forum—nor did they provide a reasonable opportunity to reject these modified terms for which they never received notice. Thus, the prior terms Plaintiff Jane Doe II and John Doe agreed to in 2016 are the operative Terms of Use and GoodRx cannot use these later, modified TOUs to try to compel their claims to arbitration. GoodRx's attempt to rely on various "screens" relating to random periods of time in which Plaintiff Jane Doe II and John Doe used their GoodRx accounts or emailed themselves coupons fail to establish "conspicuous notice" to these changed terms. *See* Section V.B.1.

---

[7] While the *Amazon* case concerned an employee-employer relationship, the Ninth Circuit made clear it equally applies to "consumer relationship[s]." *Id.* at 1101.

1     Regarding Plaintiff Marquez, it is equally unclear what "screens" he saw at the time he signed

2   up for GoodRx given that GoodRx's declarant cannot provide any factual support for her assertion that

3   they would have looked like the screen included in her supplemental declaration. *See* Section V.B.3.

4   Indeed, Ms. Cheng has already recanted her prior statement that there were other, different screens

5   Plaintiff Marquez apparently saw that GoodRx relies on in its Motion. *Id.* Assuming this "screen" is the

6   one included in Ms. Cheng's supplemental declaration (which GoodRx has not established), this is (at

7   best) a browsewrap or sign-in wrap agreement because it did not require Plaintiff Marquez to

8   affirmatively check a box or click "I agree" before proceeding with their sign-up/log-in process. And

9   as described further below, these screens are not sufficient to establish notice and assent. *See id.*[8]

10     Lastly, GoodRx cannot establish assent as to *any* Plaintiff because it has completely failed to

11   keep records reflecting that "plaintiff[s] clicked the relevant buttons" they claim signal Plaintiffs

12   "agreeing to arbitration." *Hill v. Quicken Loans Inc.*, No. EDCV190163FMOSPX, 2020 WL 5358394,

13   at *5 (C.D. Cal. Aug. 5, 2020) (denying motion to compel arbitration where company records were "not

14   sufficient to establish that plaintiff clicked relevant buttons, thereby agreeing to arbitration"). Plaintiffs

15   have requested records and data relating to Plaintiffs purported "agreement" to arbitrate their claims. In

16   response, GoodRx produced a subset of "timestamp" data it claims reflects the time Plaintiff Jane Doe's

17   (a GoodRx Care user) purportedly agreeing to arbitrate her claims. *See* Ex. G. GoodRx admitted it does

18   *not* maintain similar records for other types of GoodRx users, like Plaintiffs Jane Doe II, John Doe, and

19   Marquez—dooming any attempt to compel these Plaintiffs to arbitration. And with respect to the "data"

20   it did produce for Plaintiff Jane Doe, Mr. Gordon—GoodRx's Senior Director of Business Intelligence

21   and Analytics—who personally searched for this data admitted that he does not know what "behavior"

22   actually "triggers" this timestamp, such as whether Plaintiff Jane Doe actually clicked a check box next

23   to the TOU or merely clicked on a button like "Start Your Visit." *See* Ex. F 46:2-6 ("I'm not 100 percent

24   sure when the API request is made . . . I don't know exactly what front-end behavior triggers that [time

25

26   [8] GoodRx's attempt to characterize its TOUs as clickwrap agreement simply ignores that the basic
    feature of clickwrap agreements is the requirement that users must check a box or click a button stating
27   "I agree." *See Savetsky v. Pre-Paid Legal Servs., Inc.*, 2015 WL 604767, at *3. It presents evidence
    that only Plaintiff Jane Doe was ever presented with a checkbox relating to its TOU, and no Plaintiff
28   clicked a button stating "I agree."

stamp]"); *id.* at 48:18-49:3 ("I'm not 100 percent . . . I don't know if that request goes at the time of the check box click, or at the time of creating, or hitting the create account button, or some other step in the account creation process."). This ambiguity is only futher compounded by his admission that he "do[es] not know . . . for a fact" whether GoodRx Care users are required to select the check box next to the TOU in order to "create an account." *Id.* at 121:11-21. For these reasons discussed, GoodRx's Motion to compel arbitration should be denied in its entirety.

### 1.   Plaintiffs Jane Doe II and John Doe Were Not Properly Notified of Changes in TOUs And Had No Duty to Inquire

The analysis of mutual manifestation of assent—which requires reasonably conspicuous notice—is context specific[9] and it differs when the user "had a pre-existing contractual relationship" with the defendant from when the user sought to "register for a new online service or set up a new account." *Doe v. Massage Envy Franchising, LLC*, 87 Cal. App. 5th 23, 35 (2022). The Ninth Circuit has held that, where the terms of an existing agreement are unilaterally modified, California contract law places the burden on the party seeking to compel arbitration based on those modified terms to demonstrate that it provided sufficient notice of the ***new terms*** and that there was mutual assent to those new terms before a contract to arbitrate will be found valid. *See Jackson*, 65 F.4th at 1099 (citing Restatement of the Law Consumer Contracts § 3 (Am. *1101 L. Inst., Tentative Draft No. 2, June 2022) (noting "The new Restatement of the Law on Consumer Contracts now makes clear that a consumer must receive a 'reasonable notice of the proposed modified term' and a 'reasonable opportunity to reject the proposed modified term.'"). A party seeking to compel arbitration cannot establish "notice" based on "continued" use of the service or contractual relationship or by merely stating the terms were "accessib[le]" to the user. *Jackson*, 65 F.4th at 1099 (rejecting claim that because terms were "accessibly on the Amazon Flex app" individuals had notice and assent); *id.* at 1101 (explaining "continued performance" does not establish assent unless there is "notice" the terms have been revised). Where

---

[9] When considering the issue of conspicuousness of notice for contract formation, California courts conduct a "fact-intensive inquiry." *Sellers*, 73 Cal. App. 5th at 473; *see also B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 950 (2022) ("To frame our evaluation of the sufficiency of Blizzard's notices, we must first evaluate 'the full context of the transaction.'") (citation omitted). The Court of Appeals in *Sellers* noted that federal precedent ***does not*** provide a certainty or a bright line rule for determining the issue of reasonably conspicuous notice with respect to sign-in wrap agreements. *Id.*

notice of the new terms is not provided, plaintiffs are under no obligation to investigate whether the defendant issued new terms that changed the parties' agreement. *Id*.; *see Stover v. Experian Holdings, Inc.*, 978 F.3d 1082 (9th Cir. 2020) (quoting 17A Am. Jur. 2d Contracts § 30 (August 2020 Update)) (explaining a plaintiff "ha[s] no obligate to investigation whether [defendant] issues new terms without providing notice to her that it had sone so . . . the opposite rule would lead to absurd results: contract drafters who included a change-of-terms provision would be permitted to bind individuals daily, or even hourly, to subsequent changes in the terms).

Consistent with *Jackson* and *Stover*, courts in this district considering the enforceability of a later-added arbitration provision require the party seeking to enforce arbitration to show both: (1) that they provided clear notice that the terms have changed; and (2) that the other party assented to the changed terms. *See Sifuentes v. Dropbox, Inc.*, No. 20-CV-07908-HSG, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022) (rejecting assertion that email indicating terms had changed established notice and assent because they were not accompanied with any explanation he "could not use the service until he indicated his assent"), *appeal dismissed*, No. 22-16367, 2023 WL 2455684 (9th Cir. Jan. 20, 2023); *see also* Gina Kim, *Live Nation Fights Uphill to Arbitrate Antitrust Suit*, LAW360 (July 13, 2023 at 10:08 PM), https://www.law360.com/articles/1699585 (quoting Judge Wu at July 13, 2023 hearing in *Heckman v. Live Nation Ent., Inc. et al*, No. 2:22-CV-00047-GW-GJSX (C.D. Cal. 2023) (explaining even changing arbitration providers is a "dramatic shift" in terms raising questions "as to why there wasn't any notice of this provided . . . just to give some sort of notice for people potentially going onto the site.").

GoodRx has submitted no evidence that its TOUs included arbitration provisions before 2019, long after Plaintiff Jane Doe II and John Doe started using GoodRx's services in 2016. ¶¶ 29-30, 36. While GoodRx's unilateral addition of the arbitration provisions in January 2019 is reflected in its TOU, there is no evidence that GoodRx made any effort to notify existing users, like Plaintiffs Jane Doe II and John Doe, of this material change. Indeed, GoodRx confirmed by email on August 1, 2023 that "after conducting a reasonable search, we note that we have not, to date, identified any emails to the four Arbitration Plaintiffs relating to changes to GoodRx's Terms of Use."

1      Nor can GoodRx show that Plaintiffs would become aware of the changes "while using

2  Defendant's services." *Sifuentes*, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022) (refusing to find

3  inquiry notice even where defendant did send email notifications, because there was no evidence

4  defendant "ever tracked whether [p]laintiff had opened its email" or made clear they must assent to the

5  change in terms to continue using the service); *Jackson,.* 65 F.4th at 1099 (refusing to compel arbitration

6  merely because terms were accessible and plaintiffs continued their contractual relationship). GoodRx

7  has presented no evidence, in any form (*e.g.*, screenshots, communications to users, social media

8  postings, press releases) showing that that it notified existing users that its terms had changed in January

9  2020 to add an arbitration provision. Without such evidence GoodRx cannot show that it "adequately

10  notified [users] of the *update*" sufficient to trigger inquiry notice. *Jackson*, 65 F.4th at 1100 (refusing to

11  find inquiry notice even where defendant stated in declaration it sent email notifications of terms updates

12  to plaintiffs but otherwise produced no evidence) (emphasis added).

13      As a result, Jane Doe II and John Doe, who already agreed to the earlier versions of TOU without

14  an arbitration provision, "had no obligation to investigate whether [GoodRx] issued new terms" because

15  "the opposite rule would lead to absurd results: contract drafters . . . would be permitted to bind

16  individuals daily, or even hourly, to subsequent changes in the terms." *Stover*, 978 F.3d at 1086; *see*

17  *also Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) (vacating

18  order compelling arbitration and holding that "[p]arties to a contract have no obligation to check the

19  terms on a periodic basis to learn whether they have been changed by the other side"). Therefore, Jane

20  Doe II and John Doe never had inquiry notice of GoodRx's later-added arbitration provision and cannot

21  be found to have assented to those new terms.[10]

22      GoodRx ignores this distinction, relying on cases that do not address a unilateral change of terms

23  to a pre-existing contractual relationship.[11] *Swift v. Zynga Game Network, Inc.* is also distinguishable

---

24

25  [10] GoodRx's reliance on Jane Doe II's supposed registration for a separate free trial of GoodRx Gold

26  and the 2023 screenshot of a purported sign in page is misplaced because none of these provided any
notification of its changes of terms governing her existing relationship with GoodRx, which started
in 2016. Motion at 13-14; Cheng Decl. ¶¶ 32-25. The same is true for John Doe's coupon emailing

27  page. *See* Cheng Decl. ¶ 52.

[11] *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (involving one-time purchase

28  of tickets that did not implicate change of terms); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484

because an arbitration provision was already present in the older version of the terms plaintiff agreed to. 805 F. Supp. 2d 904, 908 (N.D. Cal. 2011).[12] Here, on the other hand, Jane Doe II and John Doe continued using GoodRx's services for years without any reason to know the terms had changed, or investigate if they had, making this case like *Sifuentes*, 2022 WL 2673080, at *3 (refusing to find assent merely based on "continued use of the website") and not the authority GoodRx cites.

### 2.   Plaintiff John Doe Was Not On Inquiry Notice

GoodRx's motion to compel Plaintiff John Doe to arbitration fails for the reasons stated in Section V.B.1. Nevertheless, even if Plaintiff John Doe only used GoodRx in August 2020 (which GoodRx has not established), GoodRx's contention that certain "screens" establish Plaintiff John Doe's assent to arbitrate his claims fails for several reasons. Motion at 6-7, 14.

*First*, GoodRx has presented no evidence of which screen Plaintiff John Doe ***actually*** saw at the time he emailed himself a coupon in August 2020. Specifically, GoodRx first contended Plaintiff would have seen a screen included in the Declaration of Gracye Change in August 2020 when he used GoodRx's "mobile website." *See* ECF No 107-2 at 10 (hereinafter referenced as "Screen A"). But GoodRx presents no evidence Plaintiff John Doe actually used GoodRx's mobile website to send himself this coupon. And, in Ms. Cheng's subsequent second declaration, she admits its possible Plaintiff may have accessed this coupon from a computer, and presents a different depiction of what that, alternative screen may have looked like in "some portion of 2020." *See* ECF No 125 at 2 (hereinafter referred to as "Screen B"). Because GoodRx presents no evidence as to which screen Plaintiff actually saw and used to email himself a coupon, and Ms. Cheng conceded at her deposition they have no record of that fact, the Court should disregard this purported "evidence." *See Sadlock v. The Walt Disney Company*, No.

---

[12] (9th Cir. 2020) (not concerning later addition of arbitration provision); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 583 (N.D. Cal. 2020) (same); *Tompkins v. 23andMe, Inc.*, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014) (same); *Alfia v. Coinbase Global, Inc.*, No. 21-cv-08689-HSG, 2022 WL 3205036, at *2 (N.D. Cal. July 22, 2022) (same); *B.D. Blizzard Ent., Inc.*, 76 Cal.App.5th 931, 943 (2022) (same); *Peterson v. Lyft, Inc.*, No. 16-CV-07343-LB, 2018 WL 6047085, at *1 (N.D. Cal. Nov. 19, 2018) (same).

[12] *Lee v. Ticketmaster LLC*, No. 18-CV-05987-VC, 2019 WL 9096442 (N.D. Cal. Apr. 1, 2019), which GoodRx relies on to demonstrate assent to new terms, stands in contradiction to California law requiring notice of updated terms and a meaningful opportunity to negotiate or reject them. As discussed further below, contracts of adhesion—including arbitration provisions—that provide no real opportunity to opt-out and survive to bind even users who discontinue services are found to be procedurally unconscionable and thus voidable.

22-CV-09155-EMC, 2023 WL 4869245, at *9 (N.D. Cal. July 31, 2023) (refusing to consider certain "register[ation]" screenshots when defendant "d[id] not provide any evidence as to which process [plaintiff] *actually* used.") (emphasis in original); *see also Lopez v. Dave Inc.,* No. 22-CV-04160-VC, 2022 WL 17089824, at *1 (N.D. Cal. Nov. 21, 2022) (criticizing defendant's "conflicting evidence regarding the sign-up screen").

 **Second**, in either case both Screen A and Screen B are insufficient to establish assent to arbitrate his claims. First, in Screen B, users can enter their email to receive a coupon and click the large blue button to the right to "send" the coupon without performing any other action. There is then a check box located **below** this "send" button stating "Send me savings offers and prescription alerts" in a reasonable sized black font. Only then, below that checkbox is (finally) in small gray font "By clicking Send, I agree to GoodRx's terms of service and privacy policy."

**SCREEN B**



 Courts routinely find hyperlinks to Terms of Use and other documents located below the button users cant click to complete the transaction insufficient to establish consent. *See Lopez v. Dave Inc.,* No. 22-CV-04160-VC, 2022 WL 17089824, at *2 (N.D. Cal. Nov. 21, 2022) (refusing to find assent to Terms of User located below "Join" button because "a user could enter their mobile number and click 'Join' without reviewing the remainder of the page (and seeing the hyperlink)").

 Screen A is likewise deficient. The "screen" that Plaintiff John Doe *might have* seen states in large black, noticeable font "Enter an email to send this coupon to:" Underneath that is only one check box next to black font "send me savings offers and prescription alerts." Users would select that check box to agree to "offers" and "alerts." It is only beneath that black text does GoodRx present, in notably smaller and gray font, the words "By clicking send, I agree to GoodRx's Terms and Privacy Policy."

1

<u>**SCREEN A**</u>



Courts including the Ninth Circuit, routinely find small gray font unaccompanied by a checkbox—like the one GoodRx deploys here—insufficient to establish assent to terms containing an arbitration provision. *See Maree v. Deutsche Lufthansa AG*, No. SACV20885MWFMRWX, 2021 WL 267853, at *4 (C.D. Cal. Jan. 26, 2021) (finding nearly identical text insufficient to establish plaintiff "clearly and unmistakably" agreed to arbitrate her claims) (including examples of 3 other deficient screens (similar to GoodRx's) from other cases); *Lopez v. Dave Inc.*, No. 22-CV-04160-VC, 2022 WL 17089824, at *2 (N.D. Cal. Nov. 21, 2022) (rejecting assent to terms presented in "tiny gray font considerably smaller than the font used in the surrounding website elements."); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (explaining text presented in small gray front is the "antithesis of conspicuous" and insufficient to establish consent, especially when next to "visual elements [that] draw the user's attention away."); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 766 (N.D. Cal. 2019) (finding text stating "By registering with JUUL Labs, Inc., you agree to the Terms and Conditions and Privacy Policy" where "Terms and Conditions" and "Privacy Policy" were hyperlinked in blue font insufficient to establish notice and assent where text was same small font as remainder of the sentence and not underlined); *Sadlock*, 2023 WL 4869245, at *9 (finding terms presented in "small font" than that "used for other text" and in "greyish" color insufficient to establish notice of terms); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) (finding grayish/white small text to hyperlinks for "Terms of Service & Privacy Policy" not conspicuous).

GoodRx also has not shown that the screens would look as they are presented to this declaration to actual users access them on mobile phones. Asked at her deposition, Ms. Cheng admitted that the company did no "device specific testing" to see how these screens would appear to Plaintiffs or other users, including to check whether the "terms" would be visible as users went to enter their information with the keyboard on their mobile phone expanded, or if they ever had to click a button as opposed to pressing "enter," which would allow them to proceed while the "terms" remained obscured—critical details that impact whether a user could assent to arbitration. Ex. E 82:7-14; 98:14 -104:6; 115:4-118:22; 123:7-124:3; 127:7-20; 138:25-139:14.

**Third,** in addition to failing to demonstrate adequate notice, GoodRx produced no data whatsoever indicating John Doe affirmatively assented to _any_ terms. The spreadsheet produced (Ex. I) only indicates that he emailed coupons. But emailing a coupon does not equal assent, which is a fact GoodRx must separately prove. As such, GoodRx fails to show, by a preponderance of the evidence, that there was mutual manifestation of assent as to John Doe. [13]

GoodRx's reliance on the clickwrap cases is misplaced because in these cases the checkboxes were right next to **and for** the statement that contained the hyperlinked terms of service. GoodRx admits the checkboxes in Screen A and B were not to indicate agreement to its TOU. _See_ Motion at 7 (claiming clicking "send" was assent to TOU not checkbox). Each of its cases is therefore distinguishable. _See Tompkins_, 2014 WL 2903752, at *3 (involving a clickwrap agreement where a checkbox was specifically dedicated to the terms of service); _Alfia_, 2022 WL 3205036, at *2 (finding sufficient notice where plaintiff "had to click a 'check box' next to the language 'I certify that I am 18 years of age or older, and I agree to the User Agreement and Privacy Policy'"); _Zynga Game Network, Inc._, 805 F. Supp. 2d at 910 (similar). The other cases GoodRx cited are even less analogous as they involve straightforward statements that draw attention to and highlight the TOU without any additional element causing confusion or distraction. _See Peter v. DoorDash, Inc._, 445 F. Supp. 3d at 583 (expressly distinguishing DoorDash's sign-in page from the one in _Colgate v. JUUL Labs, Inc._, 402 F. Supp. 3d

---

[13] In fact, GoodRx fails to produce any "data" indicating any Plaintiff aside from Plaintiff Jane Doe assented to anything, much less an agreement to arbitrate. And the data it has produced for Plaintiff Jane Doe is deficient for the reasons stated in Section V.B.5.

728 (N.D. Cal. 2019) because nothing on the page would create a "greater emphasis attending the earlier-appearing link" and thus would not cause any confusion to users); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) (finding notice sufficient where hyperlink to terms was "conspicuously displayed . . . at *each of three independent stages* that a user must complete before purchasing tickets") (emphasis added); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) (finding the hyperlink to terms and its accompanying statement conspicuous where they "were the only text on the webpage in italics" and nothing on the webpage would lead a reasonable user to believe they were assenting to something other than the terms); *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th at 935 (concerning an "online pop-up window" that was entirely dedicated to the license agreement at issue*); Lee*, 2019 WL 9096442, at *1 (involving a webpage that provides a simple warning statement that highlights the terms and does not contain any distracting element nearby); *Peterson*, 2018 WL 6047085, at *2 (providing no analysis on the issue of constructive notice).

### 3. Plaintiff Marquez Was Not On Inquiry Notice

Plaintiff Jose Marquez alleges he used GoodRx Gold between approximately June 2021 and August 2021. ¶¶ 47-49. While GoodRx represents in its Motion that Plaintiff Marquez apparently saw certain screens when signing up for GoodRx Gold on his mobile browser in June 2021, it recanted those representations in the Supplemental Declaration of Gracye Cheng. *See* ECF No. 125 (admitting the prior screens GoodRx asserted Plaintiff Marquez saw "may have gone into effect" after he used GoodRx). Ms. Cheng now states there were different screens in place "in or around June 2021" Plaintiff Marquez might have encountered at the time he signed up for GoodRx Gold on his mobile browser. ECF No. 125 at 3. Similar to with Plaintiff John Doe, GoodRx's contention Plaintiff Marquez had notice of its TOU fails for several reasons.

***First***, GoodRx has (again) failed to show which screens Plaintiff Marquez actually encountered when signing up for GoodRx Gold in June 2021. *See* ECF No. 125 (stating screens referenced in GoodRx's Motion "may" have actually been in effect in August 2021, and that other different screens were in effect "in or around June 2021"). As GoodRx has failed to present any evidence about which screens actually <u>*were*</u> in effect in June 2021, it cannot establish notice. *See Sadlock*, 2023 WL 4869245, at *9 (refusing to consider certain "register[ation]" screenshots when defendant "d[id] not provide any

evidence as to which process [plaintiff] *actually* used.") (emphasis in original); *see also In re Uber Text Messaging*, 2019 WL 2509337, at *5 ("The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence that there was an agreement to arbitrate."); *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (refusing to compel arbitration where party seeking to force arbitration failed to establish by preponderance of evidence that it was party to arbitration agreement).

**Second**, even if Plaintiff Marquez *did* see the screens GoodRx now seems to contend were applicable in June 2021 (ECF No. 125 at 3), these screens are still insufficient to establish notice.[14] As depicted in the Supplemental Declaration of Gracye Cheng, these screens begin in large white font against a black backdrop stating "Get up to 90% savings with GoodRx Gold." Users are then told in blocked off text next to gold diamonds that this is "**FREE**" in bold font "for 30 days" and that users can "Cancel anytime." They are then told "Plan options for you and your family" and "Exclusive access to Gold Support" next to similarly distinguishable gold diamonds. Then, the screen states in offset bold black font "Create your account" followed by the words "Enter your information to start your Gold membership."

Only after users enter their first name, last name, email address, and birthday, is there additional text in significantly smaller font. This text begins by stating "Your Gold account name and birthdate must match what is on your prescription(s)" and then, only after this statement, does it state in similarly small font "By continuing you agree to GoodRx's Terms of Use and Privacy Policy." The hyperlinks to "Terms of Use" and "Privacy Policy" are in the same small font used for the remainder of this sentence, and the hyperlinks are not underlined. Users then select a button stating "Join for free."

---

[14] GoodRx's Motion does not address these new screens Ms. Cheng now contends Plaintiff Marquez may have encountered. *See* ECF No. 125 at 3.

**SCREENS AVAILABLE "IN OR AROUND JUNE 2021"**

   

As these screens show, GoodRx placed the emphasis on the "**FREE**" services it was providing and its offer of "90% savings"—not its TOU. Indeed, even the button users may click emphasize the "free" nature of this transaction stating "Join for free" and not "Agree" or "Agree to Terms." Courts find screens that offer "trials" and free or discounted services (like those here) often fail to establish assent because users do "not anticipate that they would enter into an ongoing relationship governed by extensive contractual terms simply because they submit[]" to a "trial." *See Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444 (Cal. Ct. App. 2021). This is especially true here, where GoodRx has chosen to incorporate certain design elements emphasizing the "FREE" savings in bold font, and "exclusive" benefits next to gold diamonds, but presents the TOU in significantly small, barely legible font. *See Sadlock*, 2023 WL 4869245, at *9 (rejecting similar screens that used a "font size smaller than that used for other text" despite that TOU link was in "blue" because it ultimately emphasized "other elements on the screen that distract" such as the "exhortation to 'Get the best movies, shows and sports" and "Upgrade" to "Hulu with no ads" presented in "larger size font and employ design elements such as bolding to catch the eye."); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (rejecting statement "I understand and Agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy" presented in small font directly before "Continue" button as sufficient to establish notice to arbitration provision); *Maree v. Deutsche Lufthansa AG*, No.

28

1   SACV20885MWFMRWX, 2021 WL 267853, at *4 (C.D. Cal. Jan. 26, 2021) (rejecting statement "By

2   selecting to complete this booking I acknowledge that I have read and accept the above Rules &

3   Restrictions, Terms of Use and Privacy Policy and Government Travel Advice" established notice

4   despite that Terms of Use were in blue font because the statement otherwise lacked "highlight[s],

5   underline[s] . . . capital letters" or otherwise made the text "conspicuous"); *see also Sellers,* 73

6   Cal.App.5th at 481-82 (holding "[e]ven text that is just slightly smaller . . . exceed the limits of what

7   constitutes adequate notice" and rejecting claim small font statement with underlined link to TOU

8   established notice).

9          **Third**, GoodRx fails to carry its burden of establishing Plaintiff Marquez assented to the TOU

10   and agreed to arbitrate his claims because it has not produced (and does not keep) records tracking

11   which terms (if any) GoodRx Gold users ever agree to. This too dooms GoodRx's Motion.

12          **4.      Plaintiff Jane Doe II Was Not On Inquiry Notice**

13          GoodRx does not attempt to "depict" or demonstrate what any screens would have looked like

14   at the time Plaintiff Jane Doe II used GoodRx in 2016. ¶ 29. Nor does GoodRx attempt to show what

15   the screens Plaintiff Jane Doe II would have encountered when she signed up for GoodRx Gold looked

16   like in March 2020.[15] Rather, GoodRx merely stated in conclusory fashion that Plaintiff Jane Doe II

17   "would have bene presented with a page with a button located near the phrase 'By continuing, you agree

18   to GoodRx's Terms of Service and Privacy Policy" and would have "click[ed] [a] button." Motion at 5.

19   This, of course, is wholly insufficient to establish conspicuous notice.

20          First, GoodRx presents no evidence supporting its claim this is what the screens purportedly

21   looked like or stated. Second, these brief two sentences (even if true) do not provide enough detail for

22   the Court to conduct the necessary "fact-intensive inquiry" in order to evaluate whether the "textual

23   notice [is] sufficiently conspicuous." *Berman*, 30 F.4th at 868 n.4. Indeed, it actually raises more

24   questions than answers. For instance, (1) where was this text located on the page; (2) what other text

25

26   ---
[15] GoodRx claims March 2020 is when Plaintiff Jane Doe II created her GoodRx Gold account. As
     described in Section III, however, Plaintiff has used GoodRx since 2016 and given this continuing
27   contractual relationship, GoodRx was required to provide clear notice of changes or modifications
     to these terms and did not. Plaintiffs nevertheless address why these 2020 "screens" it does not
28   produce but instead describes are wholly deficient to establish assent.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND/OR STAY
CASE NO. 3:23-CV-00501-AMO

was included on the page; (3) what font size was used; (4) was it smaller than other text on the page; (5) was the statement presented in a noticable font, as opposed to gray with blue text only indicating the hyper link; (6) where was this supposed "button"; (7) what text was on the button; and (8) was the button located **before** the statement regarding the TOU such that users could have clicked it without seeing or viewing the remaining text on the page? These are all details Courts consider in evaluating notice. *See* Section V.B.1 and 2. Without this information, GoodRx cannot establish by a preponderance of the evidence that Plaintiff Jane Doe II had notice or assented to its TOU.

### 5. GoodRx Has Not Established Assent for Any Plaintiff

Because GoodRx has utterly failed to keep records reflecting that that "plaintiff[s] clicked the relevant buttons" they claim signal Plaintiffs "agreeing to arbitration," its Motion fails entirely. *See Hill v. Quicken Loans Inc.*, No. EDCV190163FMOSPX, 2020 WL 5358394, at *5 (C.D. Cal. Aug. 5, 2020) (denying motion to compel arbitration for similarly deficient record keeping practices); *see also Belyea v. GreenSky, Inc.*, No. 20-CV-01693, 2020 WL 3618959, at *7 (N.D. Cal. July 2, 2020) (denying motion to compel arbitration where defendant presented no evidence or records reflecting that plaintiff "received or reviewed" terms including the arbitration provision and rejecting assertions of Defendant's declarant that only included "general statement[s]" and did not include supporting "evidence as to who sent the[] documents, when they were sent, and how they were sent and received.").

GoodRx has produced no data or information demonstrating that Plaintiff Jane Doe II, John Doe, or Jose Marquez actually clicked certain "buttons" indicating they purportedly "agree" to anything, let alone that the terms or links to terms were visible to them, or that they agreed to arbitrate their claims. And with respect to Plaintiff Jane Doe, while GoodRx claims to have produced a subset of "timestamp" data showing the time Plaintiff Jane Doe seemingly agreed to its TOU, the testimony of GoodRx's Senior Director of Business Intelligence and Analytics shows this is not the case. Indeed, Mr. Gordon, who personally searched for and collected these records, indicated he is not sure what "behavior" exactly triggers this time stamp, leaving open the possibility that this is not when Plaintiff Jane Doe checked a box next to the TOU and, instead, when she performed some other action on the GoodRx Care website. *See* Ex. F at 46:2-6 ("I'm not 100 percent sure when the API request is made . . . I don't know exactly what front-end behavior triggers that [time stamp]"); *id.* at 48:18-49:3 ("I'm not

1   100 percent . . . I don't know if that request goes at the time of the check box click, or at the time of

2   creating, or hitting the create account button, or some other step in the account creation process."). This

3   is especially alarming as Mr. Gordon does not know whether Plaintiff Jane Doe—or any GoodRx Care

4   users—are required to select the checkbox next to the TOU in order to "create an account." *Id.* at 121:11-

5   21 (admitting he "do[es] not know . . . for a fact" whether this is the case). Thus, GoodRx lacks sufficient

6   evidentiary support to show by a preponderance of the evidence that any Plaintiff agreed to to forego

7   their litigation rights and arbitrate their claims.

8       **C.    GoodRx's Arbitration & Delegation Clauses Are Unconscionable**

9           To establish unconscionability, Plaintiffs must show "procedural and substantive

10  unconscionability, but both 'need not be present in the same degree'" and are evaluated on a sliding

11  scale. *Lim v. Tforce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021); *Nagrampa v. MailCoups, Inc.*,

12  469 F.3d 1257, 1282 (9th Cir. 2006) (explaining unconscionability is a "sliding scale" such that "the

13  more substantively oppressive the contract term, the less evidence of procedural unconscionability is

14  required to come to the conclusion that the term is unenforceable and vice versa.") (internal citations

15  omitted). Procedural unconscionability focuses on "oppression" or "surprise" arising from "inequality

16  of bargaining power" where as substantive unconscionability focuses on whether the agreement results

17  in "harsh" or "one-sided" results. *Id.* at 1280.[16]

18          It is undisputed that none of the arbitration provisions apply to Plaintiffs E.C. and Wilson, for

19  whom GoodRx admits it has no evidence they agreed to arbitration. *See* Section V.A, above. As for

20  Plaintiffs Jane Doe, Jane Doe II, John Doe, and Marquez, the arbitration provisions and attendant

21  delegation clauses (while unenforceable for the reasons described above) are procedurally and

22  substantively unconscionable.

---

25  [16] GoodRx's purported "delegation clause" is unenforceable because there is no clear agreement with
    any Plaintiff to arbitrate their claims. *See* Section V.A. But in any event, this court is "the proper entity
26  to rule on . . . challenges to the enforceability of the delegation clause" where like here, Plaintiffs have
    "asserted a specific, substantive challenge to the delegation clause." *Nielsen Contracting, Inc. v. Applied*
27  *Underwriters, Inc.*, 22 Cal. App. 5th 1096, 1113 (2018); *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th
    1109, 1145 (2013) (explaining a party who presents an "unconscionability defense" shall have that
28  defense heard on the "merits . . . determined by the trial court in the first instance.").

1.    **The Arbitration & Delegation Clauses Are Procedurally Unconscionable**

California courts evaluating procedural unconscionability focus on whether there is "oppression" i.e., an "inequality of bargaining power that results in no real negotiation and an absence of meaningful choice" or "surprise" such whether terms are "hidden in a prolix printed form drafted by the party seeking to enforce them." *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1282 (9th Cir. 2006); *Lim*, 8 F.4th at 1000 (explaining procedural unconscionability focuses on "oppression or surprise due to unequal bargaining power"). The arbitration provisions here, including the delegation clauses, are procedurally unconscionable as to Plaintiffs Jane Doe II and John Doe specifically because GoodRx has unilaterally added these clauses in its TOUs, along with its arbitration provision without any notice (*see* Section V.B above), and as to all Plaintiffs because they are contracts of adhesion.

As discussed in Section V.B., GoodRx failed to notify existing users, like Jane Doe II or John Doe, of its addition of the arbitration provisions, and thus the delegation clauses, to its TOU after they had already agreed to earlier versions of TOU without such provisions. This is a classic example where unequal bargaining power has caused unfair surprise and oppression, and as a result, the delegation clause and arbitration provision should not be enforced as to these Plaintiffs. *Long v. Fid. Water Sys., Inc.*, No. C-97-20118 RMW, 2000 WL 989914, at *3 (N.D. Cal. May 26, 2000) (denying motion to compel arbitration because of defendant's "unilateral imposition" of a delegation clause that "eliminate[s] the right to have a court decide if the arbitration clause was even valid or enforceable"); *see also Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 1100 (2002) (finding sneaking terms in a "bill stuffer" on a "take it or leave it" basis requiring plaintiff to "close his account" if he "did not wish to accept the amendment" was "oppressive").[17]

―――――――――――――

[17] California District Courts currently addressing similar unilateral changes to TOUs without notice to be "so procedurally unconscionable that the substantive unconscionability that would shock the conscience doesn't have to be so high or large. It could be relatively … less shocking than otherwise would be [required], if this present situation weren't so procedurally unconscionable." Gina Kim, *Live Nation Fights Uphill to Arbitrate Antitrust Suit*, LAW360 (July 13, 2023 10:08 PM), https://www.law360.com/articles/1699585 (quoting Judge Wu at July 13, 2023 hearing in *Heckman v. Live Nation Ent., Inc. et al*, No. 2:22-CV-00047-GW-GJSX (C.D. Cal. 2022)). Importantly, Judge Wu found this to be the case even though the TOU had already included an arbitration provision and merely changed certain terms relating to how the claims would be arbitrated.

1    GoodRx's arbitration provision and delegation clause is also procedurally unconscionable as to

2  all Plaintiffs (Jane Doe II and John Doe included) because they are part of an agreement of adhesion,

3  which exists when there is no meaningful right to opt out. *Ortolani v. Freedom Mortg. Corp.*, No.

4  EDCV171462JGBKKX, 2017 WL 10518040, at *3 (C.D. Cal. Nov. 16, 2017) (citing *Nagrampa*, 469

5  F.3d 1257 at 1281) (explaining whether arbitration agreement is a contract of adhesion is the "threshold

6  inquiry" in unconscionability analysis). The arbitration provisions, including the delegation clauses, are

7  contracts of adhesion, which courts have routinely found to be procedurally unconscionable. *Lim*, 8

8  F.4th at 1001 (finding the delegation clause as procedurally unconscionable because it was offered on a

9  "take-it-or-leave-it" basis); *Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 420 (N.D. Cal. 2015) (similar);

10  *see also Durruthy v. Charter Commc'ns, LLC*, No. 20-CV-1374-W-MSB, 2020 WL 6871048, at *7

11  (S.D. Cal. Nov. 23, 2020) (finding delegation clause procedurally unconscionable where it was offered

12  on a take it or leave it basis and there was no "opt-out" opportunity); *Ortolani*, 2017 WL 10518040, at

13  *3 (quoting *Szetela*, 97 Cal. App. 4th at 1100, *abrogated on other grounds* ("When the weaker party is

14  presented the clause and told to 'take it or leave it' without the opportunity for meaningful negotiation,

15  oppression, and therefore procedural unconscionability, are present."); *Shea v. Household Bank (SB),*

16  *Nat'l Assn.*, 105 Cal. App. 4th 85, 90 (2003) (noting a "good case" is made for unconscionability due to

17  adhesion where amendments to TOUs adding arbitration provisions are "take it or leave it," and where,

18  even if consumer "leaves" by discontinuing use of services, arbitration "agreement" survives

19  termination of account and renders consumer still subject to arbitration provisions; "the practical result

20  is consumer has no choice at all and is forced to 'agree' to the modification").

21    Here, the versions of the arbitration provisions and delegation clauses that all Plaintiffs allegedly

22  agreed to in the post-2020 TOUs are procedurally unconscionable as they are indisputably contracts of

23  adhesion. *See, e.g.*, Jan. 2020 TOU, ECF No. 107-5 at 3 ("If you do not agree to these Terms, you may

24  not access or use the Services."); Feb. 2023 TOU, ECF No. 107-6 at 2 ("If you do not agree to these

25  Terms, do not access or use the Services."); Jul. 2020 TOU, ECF No. 107-7 at 2 ("If you do not agree

26  to these Terms, you may not access or use the Services."). The TOUs do not provide any means for

27  Plaintiffs to opt out, and they purport to bind them to their terms even if Plaintiffs had immediately

28

1   elected to discontinue using GoodRx services if they read the TOU after signing up or using GoodRx.

2   *See id*. The unconscionable nature of this process is even worse for individuals, like Plaintiffs Jane Doe

3   II and John Doe, who used GoodRx prior to the 2019 addition of the arbitration provisions and

4   delegation clause unilaterally snuck into GoodRx's lengthy TOUs without any notice of the material

5   change. *See* Section V.B.1, above. In light of the unfair surprise and oppression that these delegation

6   clauses have caused to Plaintiffs, they must be procedurally unconscionable.

> ### 2.   The Arbitration & Delegation Clauses Are Substantively Unconscionable

7         GoodRx's arbitration and delegation clauses are also substantively unconscionable for all

8   Plaintiffs because (1) they lack mutuality and are one-sided; and (2) purport to delegate clearly non-

9   delegable issues to the arbitrators. For instance, the clauses that Plaintiffs allegedly agreed to would

10  delegate and require arbitration of "any dispute, claim or controversy arising out of or relating to . . .

11  ***your*** [(i.e., consumers)] access to or use of the Services" to arbitrators and ***reserve*** the right for disputes

12  regarding the "protect[ion of] . . . intellectual property."[18] It is disproportionately unlikely that GoodRx

13  would bring any claim regarding a user's "access to or use of" its services. *Id.*; see also Ex. E 130:4-17

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On the

15  other hand, it is extremely likely GoodRx would bring disputes regarding the protection of "its

16  intellectual property" and that ordinary consumers (who primarily do not have intellectual property, let

17  alone ones that GoodRx would infringe) would not. Thus, in effect, it is only Plaintiffs and consumers

18  who would be required to delegate and arbitration their claims, whereas—for the types of claims

19  GoodRx a would bring—they can, of course, be heard in federal court and would not be subject to these

20  provisions.

21         Courts in this district find these types of one sided agreement that apply the delegation clause

22  and arbitration provisions disproportionately to the user but not the company substantively

23  unconscionable. *Bielski v. Coinbase, Inc.*, No. C 21-07478 WHA, 2022 WL 1062049, at *4 (N.D. Cal.

24  Apr. 8, 2022) (finding delegation clause substantively unconscionable where the delegation clause on

25  its face mutually delegates both parties' claims but in effect just applies to "disputes that have

---

[18] GoodRx Terms of Use, GOODRX, (lasted updated March 30, 2023)
https://support.goodrx.com/hc/en-us/articles/11404313220635-GoodRx-Terms-of-Use.

previously gone through the pre-arbitration complaint procedure" which only individual users could bring); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1286–87 (9th Cir. 2006) (finding substantive unconscionability where is it "far more likely" that plaintiffs and not defendant "would assert claims" subject to arbitration provision and defendant could (on the other hand) bring any claim in federal court "as long as the claim . . . implicated [defendants] . . . proprietary information.").

Additionally, the delegation clauses at issue purport to delegate issues such as the "existence" or "formation" of the arbitration agreements to an arbitrator. Such a provision is ***strictly*** unenforceable in California because the formation of contract issue is "not [] delegable" to an arbitrator. *Belyea v. GreenSky, Inc.*, No. 20-CV-01693, 2020 WL 3618959, at *3 (N.D. Cal. July 2, 2020) (rejecting assertion that "whether Plaintiff agreed to the Arbitration Provision" was a delegable issue and denying motion to compel arbitration); *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1248 (N.D. Cal. 2019) ("The issue of contract formation, however, is not a delegable gateway issue."); *Almaznai v. S-L Distribution Co., LLC*, No. 20-CV-08487-JST, 2021 WL 4457025, at *10 (N.D. Cal. June 21, 2021) (explaining "whether a valid arbitration agreement exists" is "not a delegable gateway issue" and denying motion to compel arbitration); *Burzdak v. Universal Screen Arts*, Inc., No. 21-cv-02148, 2021 WL 3621830, at *3 n.2 (N.D. Cal. Aug. 16, 2021) (same). As a result, these provisions are also substantively unconscionable and should be disregarded.

### D. GoodRx's Arbitration Provisions Are Not Enforceable Under the *McGill* Rule

Additionally, GoodRx's arbitration provisions are unenforceable to the extent they seek to require arbitration of Plaintiffs' requests for public injunctive relief under California consumer protection laws because of the "*McGill* Rule." *See McGill v. Citibank N.A.*, 2 Cal. 5th 945, 962 (2017) (holding that an arbitration provision cannot "waive [a plaintiffs] right to seek public injunctive relief" under the UCL and CLRA in federal court because, under California law, "a law established for a public reason cannot be contravened by a private agreement"). The Ninth Circuit has adopted the *McGill* rule, expressly explaining that "the FAA does not preempt" this doctrine. *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 831 (9th Cir. 2019).

Plaintiffs here are seeking the exact kind of public injunctive relief protected by the *McGill* Rule.

Public injunctive relief is a relief "that has 'the primary purpose and effect of' prohibiting unlawful acts that threaten future injury to the general public." *Snarr v. HRB Tax Grp., Inc.*, 839 F. App'x 53, 54 (9th Cir. 2020). The Ninth Circuit has specifically held that "relief which enjoins deceptive practices directed at the public is public injunctive relief." *Id.* at 55 (finding public injunctive relief where it sought to enjoin deceptive information regarding defendant's "web services and advertising"); *see also Stout v. Grubhub Inc.*, No. 21-CV-04745-EMC, 2021 WL 5758889, at *6 (N.D. Cal. Dec. 3, 2021) (finding public injunctive relief where it sought to enjoin defendant from "from continuing to engage, use, or employ [its] practice of misrepresenting [its] delivery fees").

Here, Plaintiffs have specifically sought public injunctive relief under multiple causes of action, including UCL and CLRA addressed in *McGill*, requiring GoodRx to (among other things) "notify . . . members of the general public about its data sharing activities with the Advertising and Analytics Defendants." ¶ 213. This injunction is aimed at the general public because it would serve to "eradicat[e] Defendants' continuing deceptive conduct" and to correct their past misrepresentations and omissions about "GoodRx's data sharing and privacy policies" that were also directed at the general public through its marketing, website, apps and other means. ¶¶ 216-18. Further, despite Defendant GoodRx's assertions to the contrary (*see* Motion at 20-21), GoodRx users as well as the general public are still impacted by GoodRx's ongoing surreptitious data collection, tracking, and sharing practices. To this day, anyone who visits a GoodRx platform, whether or not they purportedly assent to any terms, falls prey to the Meta Platforms, Google, Criteo, and other tracking and data interception technology embedded in GoodRx Platforms for marketing, advertising, and analytics purposes. *See* ¶¶ 61-65, 67-75, 79-83, 87-89, 124-139, 144-154, 158-161, 163-166; Ex. H. Therefore, the injunction Plaintiffs seek constitutes a claim for public injunctive relief under *McGill*. *Stout*, 2021 WL 5758889, at *7 ("prohibition of false advertising which affects not just existing Grubhub customers but the broader public").

GoodRx's arbitration agreements violate *McGill* in that they preclude such public injunctive relief in all fora. Specifically, each version of the arbitration agreements that Plaintiffs allegedly agreed to include a clear prohibition against public injunctive relief: "The Arbitrator may award declaratory or

injunctive relief *only in favor of the claimant* and only to the extent necessary to provide relief warranted by the claimant's *individual* claim."[19] *See* Jan. 2020 TOU, ECF No. 107-5 at 5; Feb. 2023 TOU, ECF No. 107-6 at 4; Jul. 2020 TOU, ECF No. 107-7 at 4. Courts have found much less restrictive language to constitute a sufficient ban on public injunctive relief and render them invalid. *Jeong v. Nexo Cap. Inc.*, No. 21-CV-02392-BLF, 2023 WL 2717255, at *8 (N.D. Cal. Mar. 29, 2023) (finding defendant's provision precludes public injunctive relief where it merely states "Any relief awarded cannot affect other Clients of [defendant]."); *Blair*, 928 F.3d at 831 (finding arbitration agreement problematic under *McGill* because it "prohibits the arbitrator from awarding 'relief that would affect [defendant's] account holders other than you'"); *Jack v. Ring LLC*, 91 Cal. App. 5th 1186, 1204 (2023), *review filed* (June 30, 2023) (finding agreement language sufficient to trigger *McGill* where it states "relief could be awarded 'only on an individual (non-class, nonrepresentative) basis and could not be awarded 'for ... anyone who is not a party'"). This Court should hold the same.

Because the *McGill* rule applies, the severability clauses in these arbitration agreements have rendered the underlying claims, not just the issue of public injunctive relief, appropriate for court's consideration. In *Blair*, the Ninth Circuit found that a severability clause does not only carve out the public injunctive remedy, but also the "underlying claim" where the clause states that "If there is a final judicial determination that . . . precludes enforcement of this Paragraph's limitations as to a particular *claim for relief*, then that *claim* (and only that claim) must be severed from the arbitration and may be brought in court." *Blair*, 928 F.3d at 831. The severability clauses in GoodRx's arbitration agreements contain almost the same language: "to the extent that any *claims* must therefore proceed on a class, collective, consolidated, or representative basis, such *claims* must be litigated in a civil court of competent jurisdiction." Jan. 2020 TOU, ECF No. 107-5 at 6; Feb. 2023 TOU, ECF No. 107-6 at 5; Jul. 2020 TOU, ECF No. 107-7 at 5. Thus, all underlying claims that give rise to Plaintiffs' public injunctive relief are not arbitrable under *McGill*, which includes at least the UCL and CLRA.

---

[19] GoodRx's Responses and Objections to Interrogatories and documents produced by GoodRx indicate that TOUs contained arbitration provisions "at least as of January 2, 2020" for GoodRx and "at least as of May 1, 2017" for Hey Doctor (GoodRx Care's predecessor).

**VI.     The Advertising and Analytics Defendants' Motions Should Be Denied**

> **A.     Plaintiffs E.C. and Wilson's Claims Against the Advertising and Analytics Defendants Should Proceed Irrespective of the Motions to Compel Arbitration**

The Advertising and Analytics Defendants each argue that all Plaintiffs claims, including those of Plaintiffs E.C. and Wilson who definitively could not agree to arbitration should be stayed. Defendant Google LLC's Notice of Motion and Motion to Compel Arbitration and to Stay Proceedings ("Google MTC"), ECF No. 108 at 13-14; Defendant Meta Platforms, Inc.'s Notice of Motion and Motion to Stay Proceedings ("Meta MTS"), ECF No. 110 at 1-2; Defendant Criteo Corp.'s Notice of Motion and Motion to Compel Arbitration and to Stay Pending Arbitration ("Criteo MTC") at 4-5. This argument is meritless for the reasons stated in Section V.A., above. Having never agreed to arbitration, there is no equitable basis to prevent them from pursuing their claims. Nor are there any efficiencies to be gained from waiting to see the outcome of any arbitration because, to the extent the Court grants GoodRx's motion as to *other* Plaintiffs, the results would not bind Plaintiffs E.C. or Wilson. Delay would only serve to prejudice these Plaintiffs, which the Court should not allow.

> **B.     Google and Criteo Have Not Made Substantive Arguments to Compel Arbitration**

Google and Criteo do not make any substantive arguments in support of their respective Motions and instead rely entirely on the success of GoodRx's Motion to Compel Arbitration.[20] Specifically, Google's Motion argues that the equitable estoppel doctrine allows it to enforce the arbitration agreements that allegedly exist between GoodRx and Plaintiffs, but it provides no separate ground that substantively supports the existence or enforceability of these arbitration agreements vis-à-vis Google. *See* Google MTC. Google concedes as much, arguing that "*If* the Court grants GoodRx's motion to compel arbitration, the Court should also compel the Arbitration Plaintiffs to arbitrate their claims against Google." *Id*. at 2 (emphasis added). Criteo similarly argues that "Criteo has a right to enforce the Arbitration Agreement" but does not argue why it should be enforced, except from its brief reference to GoodRx's Motion. Criteo MTC at 2-3. Therefore, regardless of Google and Criteo's equitable estoppel arguments, their Motions should be denied to as to any Plaintiff for which GoodRx's Motion

---

[20] Meta did not move to compel arbitration. *See* Meta MTS.

is denied.[21]

### C.    Equitable Estoppel Does Not Apply

The doctrine of equitable estoppel may allow a non-signatory to enforce an arbitration agreement in only two circumstances: "(1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013). Courts refuse to apply equitable estoppel where non-signatory defendants seek to enforce an arbitration agreement against a signatory plaintiff. *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) ("We have never previously allowed a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff, and we decline to expand the doctrine here."); *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1169 (9th Cir. 2021) (same).

### 1.    Plaintiffs' Claims Do Not Rely on and Are Not Intimately Founded in or Intertwined with GoodRx TOUs

Google and Criteo argue that Plaintiffs' claims fall under the first prong of equitable estoppel, but this ignores the fact that Plaintiffs do not "attempt to seek any benefit from" GoodRx's TOUs. *In re Henson*, 869 F.3d 1052, 1061 (9th Cir. 2017). Equitable estoppel is only applicable to signatories that "had sought to claim the benefit of the contract," such as those that "had sued under the contract." *McKee v. Audible, Inc.*, No. CV 17-1941-GW(EX), 2017 WL 4685039, at *14 (C.D. Cal. July 17, 2017); *Aliff*, 2020 WL 5709197, at *9 (finding application of equitable estoppel "particularly inappropriate where plaintiffs seek the protection of consumer protection laws"). Where plaintiffs' claims "are not . . .

---

[21] Notably, "[a]lthough … the Federal Arbitration Act reflects a liberal federal policy favoring arbitration agreements … the question here is not whether a particular issue is arbitrable, but whether a particular party is bound by the arbitration agreement. Under these circumstances, the liberal federal policy regarding the scope of arbitrable issues is inapposite." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n. 11 (9th Cir. 2006) (emphasis in original); *see also Aliff*, 2020 WL 5709197, at *7 ("In the absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with non-signatories, the district court has authority to decide the issue of whether a non-signatory can compel arbitration." (internal citation omitted)).

39

founded upon and do not arise out of the contracts" but instead based on "statutory rights not dependent upon the terms of those contract," equitable estoppel does not apply. *In re Carrier IQ, Inc. Consumer Priv. Litig.*, No. C-12-MD-2330 EMC, 2014 WL 1338474, at *7 (N.D. Cal. Mar. 28, 2014). Here, none of Plaintiffs' statutory and common law claims arise out of GoodRx's TOUs (or any contract for that matter); rather, they arise out of Defendants' invasion of Plaintiffs' privacy by intercepting their sensitive information without consent. In *In re Henson*, the Ninth Circuit has found that these exact types of claims "have nothing to do with the [contracts]" because none of them "seek any benefit from [the contracts'] terms." 869 F.3d 1052, 1061 (9th Cir. 2017) (finding no reliance on the underlying contract where plaintiff claims that defendant "violated [] users' 'reasonable expectations of privacy by creating zombie cookies'" and that defendant "used Class members' personal, private, and confidential data for commercial gain without their knowledge or consent").

Rather, it is Defendants who rely on the TOUs to make out their ***defense***. *See* Defendant Google LLC's Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint ("Google MTD"), ECF No. 116 at 10 (raising consent defense based on language in GoodRx's TOUs); Defendant Criteo Corp.'s Motion to Dismiss the Consolidated Class Action Complaint ("Criteo MTD"), ECF No. 114 at 10 (same). Courts have repeatedly refused to apply equitable estoppel in such circumstances. *In re Carrier IQ, Inc. Consumer Priv. Litig.*, No. C-12-MD-2330 EMC, 2014 WL 1338474, at *8 (N.D. Cal. Mar. 28, 2014) (rejecting defendants' argument plaintiffs have to rely on the agreements to show lack of consent because "it is *Defendants* who are invoking the agreements to disprove Plaintiffs' factual assertions"); *Wiedenbeck v. United Educ. Inst.*, No. SACV1500810CJCJEMX, 2015 WL 12743599, at *4 (C.D. Cal. Dec. 15, 2015) (explaining that when plaintiff "is not arguing that the TOU (or any related contract) is a source of [defendant's] liability," defendant cannot invoke equitable estoppel simply "by raising the contract as a *defense*.").

Google selectively cited to numerous paragraphs in the Complaint that purportedly show Plaintiffs' reliance on GoodRx's TOUs, but such an attempt fails in light of well-established authority.[22]

---

[22] Criteo does not argue differently, incorporating Google arguments "throughout." Criteo MTC at 3 n.2.

1   In *Aliff*, the court refused to apply equitable estoppel where plaintiffs "could have been defrauded by the

2   alleged racketeering scheme even in the absence of signing [the agreements]," finding that plaintiffs'

3   claim "[was] not necessarily founded in the underlying obligations of the [agreements]." 2020 WL

4   5709197, at *9. Here, Plaintiffs' claims are not "necessarily founded" in GoodRx's TOUs and

5   accompanying Privacy Policies because Plaintiffs have at least identified one other source of

6   misrepresentation that could have misled them – GoodRx's co-CEO's tweets assuring users that their

7   sensitive data would not be shared or exploited. ¶¶ 110-11. Further, Plaintiffs' claims also rely on

8   Defendants' omissions, which are similarly is unrelated to GoodRx's TOUs. ¶¶ 348, 365, 370.

9   Therefore, Google cannot establish Plaintiffs' reliance on GoodRx's TOUs.

10          Google's reliance on *Boucher v. All. Title Co*., 127 Cal. App. 4th 262, 272 (2005), is also

11   misplaced because the court there held that plaintiff's *lost wage* claims rely on plaintiff's *employment*

12   agreement. Those are the classic contractual claims that would give rise to equitable estoppel because

13   they necessarily arise from the contract, which are not analogous to Plaintiffs' statutory and common

14   law privacy claims here.

### 2.     Defendants' Misconduct Are not Interdependent and Are Not Intimately Connected with GoodRx's TOUs

17          While this is not a conspiracy case, even in that context "[m]ere allegations of collusion are

18   insufficient to trigger equitable estoppel." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013).

19   Rather, the indispensable requirement for equitable estoppel "is that the claims the plaintiff asserts . . .

20   are dependent on or inextricably bound up with the contractual obligations." *Id*. As discussed above,

21   Plaintiffs' claims against the Advertising and Analytics Defendants do not rely on and thus cannot be

22   "inextricably bound with" the terms of GoodRx's TOUs. Equitable estoppel simply cannot apply under

23   this prong.

24          This prong is also inapplicable for the independent reason that Plaintiffs' claims against GoodRx

25   and those against the Advertising and Analytics Defendants are not interdependent. Like in *Carrier*,

26   Plaintiffs' claims here are not predicated on allegations that Defendants colluded or otherwise acted in

27   concert with GoodRx. 2014 WL 1338474, at *11. Indeed, even if GoodRx hypothetically were not at all

28   aware of Advertising and Analytics Defendants' unlawful interception of Plaintiffs' information, the

latter would still be liable for the claims that Plaintiffs brought against them.[23]

Google has pointed to several allegations that "Google's technology" is closely related to "GoodRx's Platform" in an attempt to show the interdependence of Google and GoodRx's *misconduct*. Google MTC at 10.[24] However, this argument misses the point because "[i]t is not so much the collusive behavior between the parties as it is 'the relationship of the *claims*' that is key." *Carrier*, 2014 WL 1338474, at *11. Even if both Google and GoodRx's unlawful conducts relate to the GoodRx Platform, Plaintiffs' claims against one of them are independent of those against another. The only case Google cited, *Metalclad Corp. v. Ventana Env't Organizational P'ship*, is not to the contrary because there, the signatory and non-signatory defendants "worked hand-in-hand" and "colluded to obtain [a subsidiary company] by a fraudulent contract" such that plaintiff's claims depend on one "fraudulent scheme." 109 Cal. App. 4th 1705, 1718 (2003). Here, importantly, the Advertising and Analytics Defendants are only some but not all of the data processing companies that received GoodRx's user data, and GoodRx is not the only company that uses their services either. ¶ 17.

**VII.   Plaintiffs' Claims Should Not Be Stayed as to Non-GoodRx Defendants**

All Advertising and Analyzing Defendants contend that Plaintiffs Jane Doe, Jane Doe II, John Doe, and Marquez's claims against them should be stayed in the event that they were required arbitrate with GoodRx, but this argument cannot prevail in light of the prejudice Plaintiffs would suffer from such a stay. *See* Google MTC at 10-13; Criteo MTC at 4-5; Meta MTC at 1-2. When evaluating a stay of claims against non-parties to an arbitration agreement, the must weigh the "competing interests which will be affected by the granting or refusal to grant a stay," which include "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *California Crane*,

[23] The only interdependent claim alleged in the Complaint is the adding and abetting claim for GoodRx's violation of CMIA. ¶¶ 293-98. Still, this statutory claim has nothing to do with GoodRx's TOUs and thus cannot not be a basis for invoking equitable estoppel.

[24] Criteo's argument does not meaningfully differ from Google's, asserting that the claims are interdependent because "GoodRx installed Criteo's software on its website and shared data with Criteo." Criteo MTC at 4.

621 F. Supp. 3d 1024, 1033 (citing *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005). The Ninth Circuit has "a preference for proceeding with the non-arbitrable claims when feasible" and a court should stay "only when doing so would serve some legitimate interest of the parties or the court." *Stacy Gray*, 2020 WL 12228937, at *5.

Here, no Plaintiff agreed to arbitration with any of the Analytics or Advertising Defendants and could proceed with claims against them separately from those against GoodRx in this forum. Depriving them of the right to pursue those claims with a stay would result in significant prejudiced because Advertising and Analytics Defendants continue to collect are exploiting Plaintiffs' sensitive personal information *right now*. Consolidated Class Action Complaint, ECF No. 102 ¶¶ 212-218. Indeed, each of these Defendants are continuously using Plaintiffs' and Class members' personal information for their own purposes such as improving their "personalized content delivery" or "ad targeting capabilities." ¶¶ 134-138, 153, 159. The only way for Plaintiffs to protect their already-disclosed personal information is to continue litigate the present lawsuit and obtain a remedy either through an injunction or a settlement, and a stay of Plaintiffs' claim will necessarily cause undue delay to such pursuit.

The Advertising and Analytics Defendants argue that some level of overlap between the claims against them and the claims against GoodRx justifies a stay, but that is not the law. Mere redundancy is not enough to stay claims because in a case like this, "redundancy seems inevitable" with or without a stay given that Plaintiffs E.C. and Wilson did not agree to arbitration with any Defendant and will need to litigate regardless of the outcome of this Motion. *California Crane*, 621 F. Supp. 3d at 1033 (refusing to grant stay even where "[p]laintiff asserts identical conspiracy claims against both Apple and Google, and the claims arise out of the same underlying facts"). Instead, a court looks at whether "the arbitrable claims predominate" or whether "the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004). Here, with the exception of the aiding and abetting claim, the outcome of the claims against Advertising and Analytics Defendants do not depend on a decision on GoodRx's claims because they require proving different set of misconduct. Further, the claims against GoodRx would not predominate the other claims because even if the claims against GoodRx proceed to arbitration, the "arbitrator's findings of fact or law in

1    Plaintiff's arbitration against Google would [not] be binding on this Court or otherwise have any impact

2    on the non-arbitrable claims left here." *California Crane*, 621 F. Supp. 3d at 1033. Therefore, the Court

3    should not stay Plaintiffs' claims against the Advertising and Analytics Defendants in light of the

4    prejudice Plaintiffs would suffer and the lack of benefit from a stay.

5    **VIII.   CONCLUSON**

6            Defendant GoodRx cannot demonstrate by a preponderance of evidence that it has a valid and

7    enforceable agreement to arbitrate with Plaintiffs. Nor can it show, even if there is a valid agreement,

8    which there is not, that Plaintiffs claims are encompassed by such an agreement. As such, its motion

9    should be denied its entirety.

10

11   Dated:  August 4, 2023                    By: */s/ Christian Levis*

12                                             Christian Levis (admitted *pro hac vice*)
                                               Amanda Fiorilla (admitted *pro hac vice*)
13                                             Rachel Kesten (admitted *pro hac vice*)
                                               **LOWEY DANNENBERG, P.C.**
14                                             44 South Broadway, Suite 1100
                                               White Plains, NY 10601
15                                             Telephone: (914) 997-0500
                                               Facsimile: (914) 997-0035
16                                             clevis@lowey.com
                                               afiorilla@lowey.com
17                                             rkesten@lowey.com

18
                                               *Attorneys for Plaintiff Jane Doe, Jane Doe II & Co-*
19                                             *Lead Counsel*

20                                             **BURSOR & FISHER, P.A.**
21                                             L. Timothy Fisher (State Bar No. 191626)
                                               Jenna L. Gavenman (State Bar No. 348510)
22                                             1990 North California Boulevard, Suite 940
                                               Walnut Creek, CA  94596
23                                             Telephone: (925) 300-4455
                                               Facsimile: (925) 407-2700
24                                             ltfisher@bursor.com
                                               jgavenman@bursor.com
25
                                               *Attorneys for Plaintiff Marquez & Co-Lead Counsel*
26
                                               **SCHUBERT JONCKHEER & KOLBE LLP**
27                                             Robert C. Schubert (State Bar No. 62684)
                                               Willem F. Jonckheer (State Bar No. 178748)
28

                                                    44

Amber L. Schubert (State Bar No. 278696)
2001 Union Street, Suite 200
San Francisco, CA 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law

*Attorneys for Plaintiff Jane Doe & Liaison Counsel*

**JAVITCH LAW OFFICE**
Mark L. Javitch (State Bar No. 323729)
3 East 3rd Ave., Suite 200
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
mark@javitchlawoffice.com

**ZIMMERMAN LAW OFFICES, P.C.**
Thomas A. Zimmerman, Jr. (admitted *pro hac vice*)
77 W. Washington Street, Suite 1220
Chicago, IL 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
tom@attorneyzim.com

*Attorneys for Plaintiff John Doe & Executive Committee Member*

**ISRAEL DAVID LLC**
Israel David (admitted *pro hac vice*)
Blake Hunter Yagman (admitted *pro hac vice*)
17 State Street, Suite 4010
New York, NY 10004
Telephone: (212) 739-0622
Facsimile: (212) 739-0628
israel.david@davidllc.com
blake.yagman@davidllc.com

*Attorneys for Plaintiff E.C. & Executive Committee Member*

**MOYA LAW FIRM**
Rebecca M. Hoberg (State Bar No. 224086)
1300 Clay Street, Suite 600
Oakland, CA 94612

45

Telephone: (510) 926-6521
rhoberg@moyalawfirm.com

*Local Counsel for Plaintiff E.C.*

**SHUB LAW FIRM LLC**
Jonathan Shub (State Bar No. 237708)
Benjamin F. Johns (*pro hac vice* forthcoming)
Samantha E. Holbrook (*pro hac vice* forthcoming)
134 Kings Highway
E Haddonfield, NJ 08033
Telephone: (856) 772-7200
Facsimile: (856) 210-9088
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Attorneys for Plaintiff Wilson & Executive Committee Member*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND/OR STAY
CASE NO. 3:23-CV-00501-AMO